[Cite as *State v. D.T.*, 2024-Ohio-4482.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 112955 |
| v. | : | |
| D.T., | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED; VACATED; REMANDED
**RELEASED AND JOURNALIZED:** September 12, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-674056-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Yasmine M. Hasan and Anthony Miranda, Assistant Prosecuting Attorneys, *for appellee.*

Elizabeth Miller, Ohio Public Defender, and Lauren Hammersmith, Assistant State Public Defender, *for appellant.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, D.T., appeals his convictions after he was bound over from the Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile court") to the General Division of the Cuyahoga County Court of

Common Pleas (the "general division"), and pled guilty to multiple counts in connection with four armed robberies and one attempted armed robbery. D.T. contends that his convictions and bindover should be reversed and the case remanded to juvenile court because (1) although his competency was in question, neither the juvenile court nor the adult court complied with statutory procedures to determine his competency, (2) D.T. was permitted to waive key rights and be subjected to bindover proceedings while his competency was in question and (3) the juvenile court abused its discretion in transferring D.T.'s case to the general division for criminal prosecution without sufficient credible evidence of nonamenability.

{¶ 2} For the reasons that follow, we find that the juvenile court erred in failing to hold a competency hearing and to issue a written determination regarding D.T.'s competency as required under R.C. 2152.58. In addition, we find that there is insufficient information in the record regarding the juvenile court's reasoning when ordering D.T. to be bound over to adult court for criminal prosecution in order that this court can determine whether the juvenile court abused its discretion in determining that D.T. was not amenable to care or rehabilitation in the juvenile justice system.

{¶ 3} Accordingly, we reverse the trial court's judgment, vacate D.T.'s convictions, vacate the juvenile court's transfer order and remand the case to the juvenile court for further proceedings.

**Factual Background and Procedural History**

**The Juvenile Court Proceedings**

{¶ 4} From December 30, 2021 to January 3, 2022, the State filed five delinquency complaints against D.T. (d.o.b. July 23, 2007) in juvenile court. The complaints related to then 14-year-old D.T.'s alleged involvement in five carjackings (or attempted carjackings) that occurred from December 19-27, 2021. In each incident, D.T. allegedly used or displayed a firearm. The complaints alleged that D.T. had committed acts that would constitute the following crimes if he were an adult:

> Case No. DL22100012 (December 19, 2021 incident; victim Katherine Ives): one count of aggravated robbery, three counts of robbery, one count of having weapons while under disability, one count of grand theft, one count of improperly handling firearms in a motor vehicle, one count of theft and one count of aggravated menacing.

> Case No. DL22100011 (December 21-22, 2021 incident; victim Ya Gao): one count of aggravated robbery, three counts of robbery, one count of having weapons while under disability, one count of grand theft, one count of improperly handling firearms in a motor vehicle, one count of theft, one count of identity fraud, one count of telecommunications fraud and one count of misuse of credit cards.

> Case No. DL22100010 (December 25, 2021 incident; victim Elena Donofrio): one count of aggravated robbery, three counts of robbery, one count of having weapons while under disability, one count of grand theft, one count of improperly handling firearms in a motor vehicle and one count of theft.

> Case No. DL22100086 (Dec. 26, 2021 incident; victim Ross Guidotti): one count of aggravated robbery, three counts of robbery, one count of having weapons while under disability and one count of attempted grand theft.

Case No. DL21111746 (Dec. 27, 2021 incident; victim Francis Collins): one count of attempted murder, two counts of aggravated robbery, three counts of robbery, two counts of felonious assault, one count of grand theft, one count of improperly handling firearms in a motor vehicle and one count of having weapons while under disability.

Certain of the counts in each case included one- and three-year firearm specifications.

{¶ 5} In each case, the State filed a motion for an order to relinquish jurisdiction for the purpose of criminal prosecution pursuant to R.C. 2152.10(B). D.T. denied the allegations of the complaints and objected to the motions to relinquish jurisdiction.

**Request for a Competency Evaluation**

{¶ 6} On February 17, 2022, D.T.'s counsel made an oral motion requesting that the juvenile court order a competency evaluation of D.T.[1]  The juvenile court granted the motion and referred D.T. to the Cuyahoga County Juvenile Court Diagnostic Clinic ("juvenile court diagnostic clinic") for a competency evaluation.

{¶ 7} On March 2, 2022, D.T.'s counsel again made an oral motion requesting that the juvenile court order a competency evaluation of D.T.  In a March 4, 2022

---

[1] No transcripts from the February 17, 2022 or March 2, 2022 hearings are in the record.  Accordingly, it is unclear from the record what, if any, specific concerns led defense counsel to request a competency evaluation at that time.  At his arraignment on January 18, 2022, D.T.'s mother expressed concerns regarding D.T.'s mental state — although there is an issue with the transcription of her comments.  *See* 1/18/22 tr. at 20 ("[D.T.] has a lot of health concerns, and his mental state, he needs to be evaluated based on that at home [D.T.] has attended before his mental state with his life [sic].").  At the January 18, 2022 hearing, defense counsel stated: "I do think [D.T.] is struggling with his mental health and it is deteriorating while in the Detention Center."  1/18/22 tr. at 19.

journal entry, the juvenile court indicated that it had previously granted the motion and referred D.T. to the juvenile court diagnostic clinic for a competency evaluation.

{¶ 8} On March 21, 2022, Dr. Frank Ezzo ("Ezzo"), a psychologist with the juvenile court diagnostic clinic, conducted a "competency to stand trial" evaluation of D.T. On March 23, 2022, Ezzo issued a report in which he concluded that D.T. "does not have deficits that substantially compromise his ability to understand the nature and objective of his court proceedings or to assist in his defense." The report indicates that the evaluation was "precipitated by [D.T.'s] parents raising concerns to [D.T.'s] attorney that his mental health was 'diminishing' and upon visiting the juvenile in the Detention Center his defense counsel also had similar concerns that [D.T.] may not be competent to stand trial." The report further indicates that, at the time of the evaluation, D.T. was on "Mental Health Watch" at the detention center. He reported that Jacqueline Zavatchen, a social service coordinator at the Cuyahoga County Juvenile Detention Center (the "juvenile detention center"), had informed him that D.T. was "doing pretty good" while at the juvenile detention center and had not been in any fights. Zavatchen described D.T. as "hyperactive" but stated that there were "no immediate mental health concerns." He noted that a resident adjustment report authored by Zavatchen dated March 9, 2022 indicated that D.T. was "respectful" and "cooperative" with "no behavior concerns."

{¶ 9} According to Ezzo's report, psychological testing administered by a graduate student from Cleveland State University "place[d] [D.T.]'s intelligence within the average classification range" for children of his age. Ezzo reported that

D.T. scored in the 50th percentile in verbal comprehension (which measures the ability to understand, use and think with spoken language), that D.T. scored in the 18th percentile in perceptual reasoning (which measures nonverbal reasoning skills and the ability to accurately interpret, organize and think using visual perceptual abilities), that D.T.'s reading ability (at a fourth-grade level) was in the 12th percentile and that D.T.'s full scale-4 composite score corresponded to the 30th percentile.

{¶ 10} Ezzo reported that D.T. scored in the 3rd percentile on the Inventory of Legal Knowledge assessment (which quantifies an evaluee's approach to responding to a testing measure), indicating that "some questions should be raised about an irrelevant response style." The results of a personality assessment administered to D.T. were deemed invalid.

{¶ 11} Ezzo reported that he conducted a juvenile adjudicative competence interview to assess D.T.'s ability to understand and appreciate the legal charges against him, the potential penalties he faced, the operation of the adversarial system, the roles of various trial participants and D.T.'s ability to communicate with and assist defense counsel. Ezzo discussed D.T.'s responses to questions regarding various legal topics and reported that D.T. "demonstrated a capacity for the following functions: comprehending and appreciating the severity of the charges and the possibility of a bindover; comprehending and appreciating possible consequences; understanding the adversarial nature of court and the roles of trial participants; and he can communicate with his defense attorney and assist in his

own defense." Ezzo noted, however, that "developmentally appropriate communication" by defense counsel and hearing officers was an important "part of the systemic equation in a juvenile's competency to stand trial."

{¶ 12} A copy of Ezzo's report was included in the materials forwarded to this court under seal with the record on appeal. Accordingly — although there is no reference to the report in any journal entries — it appears that the report was, in fact, at some time submitted to the juvenile court. There is, however, no indication in the record that the juvenile court ever reviewed the report. There is likewise no indication in the record to that defense counsel stipulated to the report or to any of the findings set forth in the report. No hearing was held on the issue of D.T.'s competency, and no written findings were made by the juvenile court regarding his competency.

**Waiver of Probable Cause Hearing**

{¶ 13} On June 13, 2022, after discussing the charges against him with counsel, his mother and his grandmother, D.T. agreed to waive the probable cause hearing and stipulated that the State would have been able to show probable cause as to all of the charges in the cases at issue. Before accepting D.T.'s waiver and stipulation, the juvenile court asked defense counsel whether she believed, at that time, that D.T. understood "all of the ramifications and what can occur in this Juvenile Rule 30 bindover request by the State." Defense counsel responded:

> I do, your Honor. As the Court is aware we did send [D.T.] for a competency evaluation and he came back as competent. I do think he understands the nature of the proceedings.

We don't think he's — he's not seasoned like some young men are that have been in the Detention Center, but I do think he understands what he's doing.

{¶ 14} After engaging in a colloquy with D.T. regarding the charges at issue and the effect of waiving the probable cause hearing and stipulating to probable cause, the juvenile court accepted D.T.'s waiver and stipulation, finding that they were made knowingly, intelligently and voluntarily. The juvenile court ordered an investigation into D.T.'s social history, education, family situation and any other factor relevant to whether D.T. was amenable to juvenile rehabilitation and referred D.T. to the juvenile court diagnostic clinic for a psychological evaluation.

{¶ 15} Dr. Lynn Williams, a forensic psychologist with the juvenile court diagnostic clinic, conducted a psychological evaluation of D.T. and prepared a psychological evaluation report. The State stipulated to the findings set forth in Williams' report. D.T. did not stipulate to the admissibility of, or the findings set forth in, Williams' report.

**Amenability Hearing**

{¶ 16} On August 30, 2022, the juvenile court conducted an amenability hearing to determine whether D.T.'s cases should be transferred to the general division for criminal prosecution. Williams, the five victims and Cleveland police officer Victoria Shucofsky testified on behalf of the State. D.T.'s mother, D.T.'s sister and Zavatchen testified on behalf of D.T.

**The State's Witnesses**

{¶ 17} Williams testified regarding the results of her psychological evaluation of D.T. as stated in her report. Williams stated that her opinions were based on (1) a clinical interview of D.T. on June 16, 2022; (2) communications with Applewood Centers ("Applewood") regarding D.T.'s treatment for mental health issues; (3) a risk-sophistication-treatment inventory assessment, a structured assessment of violence risk in youth and psychological testing conducted on June 15 and 16, 2022 and (4) her review of various documents, including: (a) Ezzo's competency evaluation report and the test results reported therein, (b) journal entries and other court records relating to the pending cases, (c) a juvenile evaluation referral from the probation department, (d) certain school records, (e) Ohio youth assessment system reports and detention center resident adjustment reports, (f) various probation court records from 2019-2022, (g) a Catholic Charities substance abuse assessment dated November 8, 2021, (h) police reports in the pending cases and (i) a history of charges and continuum history in the juvenile detention center from the juvenile court's iCase system.

{¶ 18} Williams testified that she tried reaching out to D.T.'s mother and maternal grandmother (D.T.'s legal guardian) on two occasions but that they did not return her calls prior to the completion of her report. Although Williams was aware that D.T. had been living primarily with his adult sister prior to his arrest, Williams did not attempt to contact her. Williams likewise did not speak with D.T.'s social service coordinator at the juvenile detention center. Williams stated that in

conducting psychological evaluations, "we focus on the custodian and . . . anything above whose ever custody [sic] is above and beyond."

{¶ 19} Williams testified that D.T. had been residing in the juvenile detention center since December 29, 2021 and was on Level 1 of the behavior management program. Prior to being remanded to the juvenile detention center, D.T. lived with his maternal grandmother (who became his legal guardian in, or around, 2008 due to his mother's substance abuse and mental health issues) or his adult sister. Williams stated that, according to the most recent adjustment report from the juvenile detention center, dated June 10, 2022, although D.T. had been in a physical altercation on May 16, 2022, no behavioral concerns were noted.

{¶ 20} Williams testified that D.T. told her that when he was living at home with family, he had "numerous AWOL (absence without permission) incidents" and had a probation violation for leaving home without permission. She indicated that D.T. told her that he did not feel he needed to ask for permission to leave because he was not doing anything that would get him into trouble, e.g., leaving home without permission to go to the Salvation Army. Williams stated that D.T. told her that most of his friends were "negative and court involved" and that court records indicated that he associates with older peers. She noted that D.T. denied any gang involvement.

{¶ 21} Williams stated, that based on his school records, D.T. had a total of 14 "behavior incidents" between 2017 (when he was 9 or 10) and 2022, including an expulsion from school in 2017 when D.T. and a friend stole his teacher's phone and

hid it in his backyard, a dismissal from school in October 2021 for inappropriately touching a school staff member and a suspension for smoking marijuana in the school restroom (no date provided). She stated that he also had excessive unexcused school absences.

{¶ 22} With respect to D.T.'s intellectual ability and academic performance, Williams testified that, at the time of her report, D.T. was in the 8th grade, that D.T. had never qualified for special education services[2] and that from 2017-2022, his grades varied widely from As to Fs, with all Fs in 2022. Williams stated that D.T.'s teacher in the juvenile detention center had described D.T. as an "excellent student," who was working ahead on 9th grade credits while completing his 8th grade credits. The teacher further commented: "He stays on track and very rarely needs to be redirected. He is polite and gets along well with other students and staff. [D.T.] has been no major problem. He participates well and follows my instructions."

{¶ 23} Referring to the results of intellectual testing administered on March 21, 2022, i.e., the intellectual testing referenced in Ezzo's report, Williams stated that D.T. scored "within the average classification range" with an IQ of 92 in the 30th percentile, meaning that he was "above the range for intellectual deficiency." She noted, however, that D.T. lacks basic reading skills (scoring in the 12th percentile at a fourth-grade level) and likely meets the criteria for functional illiteracy.

---

[2] There is nothing in the record to indicate whether D.T. was ever evaluated for special education services.

{¶ 24} Williams reported that the first personality test that was administered to D.T., i.e., the personality test referenced in Ezzo's report, was deemed invalid based on the validity scales. She reported that in a second personality test she and/or her staff administered, D.T. "endorsed multiple items at a high level of symptoms," indicating "a possible exaggeration, which is also considered a cry for help." She reported that D.T. endorsed "high levels of anxiety, depression and trauma symptoms" in the trauma symptom checklist for children (a self-report inventory used to assess trauma-related symptoms).

{¶ 25} With respect to D.T.'s mental health, Williams testified that D.T. had been receiving mental health services through Applewood while at the juvenile detention center. Applewood's Director of Mental Health advised Williams that D.T. was reported to have "high levels of distractibility, hyperactivity, impulsivity and troubles [sic] concentrating" and to have exposed himself to female staff. Although D.T. had "no history of mental health diagnoses or intervention in the community," Williams stated that, while at the juvenile detention center, he had been diagnosed with attention deficit hyperactivity disorder ("ADHD") for which he was taking psychiatric medication.

{¶ 26} Williams reported that D.T. began using marijuana at age 11, that he used it daily and that he had completed a substance abuse assessment through Catholic Charities, which diagnosed him with a cannabis use disorder-moderate severity and recommended outpatient services. She stated that probation records indicated that D.T. had a positive drug screen (no date provided).

{¶ 27} Williams testified that during her evaluation of D.T., he "endorsed some symptoms consistent with mood changes and anxiety" but that there were "no complaints related to reality testing impairments." Williams stated that, based on her evaluation, she believed D.T. could be diagnosed with conduct disorder-unspecified onset-moderate severity and adjustment disorder with anxiety. Williams stated that she did not yet have sufficient information to support a diagnosis of ADHD, cannabis use disorder-moderate-in early remission-in a controlled environment or a specific learning disorder with impairment in reading and that these would need to be "rule[d] out." Williams explained that because her evaluation was a "limited scope evaluation," she did not have sufficient information or assessments to determine whether all the criteria were met "to give a definite diagnosis." She stated that D.T. did not then meet the criteria for a trauma-informed diagnosis.

{¶ 28} Williams testified that this was D.T.'s fourth involvement with the juvenile court but that he had never been sentenced to the Ohio Department of Youth Services ("ODYS"). In May 2019, when D.T. was 12 years old, he was adjudicated a delinquent on charges of burglary and theft for which he was sentenced to community control and ordered to participate in a mentoring program. In October 2020, when D.T. was 14, he was adjudicated a delinquent on charges of attempted breaking and entering, theft, criminal damaging, obstructing official business and unauthorized use of a vehicle. An unspecified probation violation occurred on May 13, 2021. In July 2021, D.T. was adjudicated a delinquent on

charges of theft and referred to drug court. The drug court referral was not completed because of the new offenses with which D.T. was charged in the matter at issue. In her report, Williams noted that D.T. "did not have an adjudicated history of carrying or using weapons."

{¶ 29} Williams indicated that when D.T. was on home detention, he had numerous home detention violations for leaving home without permission as well as school suspensions. She also noted that D.T. had completed 24 hours of community service.

{¶ 30} Williams stated that while on probation, D.T. had been referred to two mentoring programs, Cleveland Peace Makers Alliance and Renounce Denounce, but that she was "not aware" whether the programs had been successfully completed. Williams indicated that D.T. had also been working with a mentor though his school, but that that mentoring stopped after D.T. refused to attend.

{¶ 31} When asked to summarize D.T.'s "risk for violence," Williams stated that, "[b]ased on the risk factors" — including D.T.'s previously adjudicated cases and the charges in the cases at issue, his history of conduct problems (school expulsions and suspensions), truancy, negative associations, difficulties in school achievement while in the community — D.T. "scored in the high range" on the structured assessment of violence risk in youth (an assessment composed of 24 factors in three risk domains — historical risk factors, social/contextual risk factors and individual/clinical risk factors — "drawn from existing research and the

professional literature on adolescent development as well as on violence and aggression in youth").

{¶ 32} Williams testified that on the sophistication-maturity subscale of the risk-sophistication-treatment inventory, D.T. scored in the 91st percentile — the "high offender range" as compared with other juvenile offenders. Williams explained:

> This construct can have two different meanings in the juvenile justice population. These skills can be used toward prosocial goals as a favorable and positive attribute; however, when this attribute is used for delinquent or criminogenic purposes, sophistication and maturity become a distinct liability. On a subscale capturing a youth's level of autonomy, [D.T.] was in the high range, reflecting that he has begun to develop a sense of himself as an independent person. This high score indicates that [D.T.] has some internal locus of control (the belief that outcome of his action is a result of his own ability) and ability to consider potential consequences in a larger framework. He has developed some decision-making skills including cost-benefit analysis, or the ability to weigh the consequences of different outcomes ahead of the action. [D.T.] has the ability to manage and regulate emotions to attain goals, but he does not consistently apply the ability to control his emotions and behavior to attain prosocial goals. He is aware of the wrongness of crimes and understands behavioral norms. Taking into consideration probable cause found for the instant offenses, [D.T.] is displaying a higher level of sophistication and maturity and using these emerging skills in a criminogenic manner.

{¶ 33} With respect to treatment amenability, Williams stated that D.T. scored in the 21st percentile — the "middle range" as compared with other juvenile offenders. She indicated that this means D.T.'s characteristics are "mixed for treatment amenability" — i.e., there are "some positive characteristics, but also characteristics that are difficult to treat." Williams stated that D.T.'s classification in the "middle range" was based on the fact that D.T. had had several prior

unsuccessful treatment interventions, i.e., multisystemic therapy, the Tapestry program and mentoring, and the fact that D.T. displayed a negative attitude toward authority and had difficulty adhering to rules and expectations while being monitored on probation, on home detention and in the juvenile detention center. Williams indicated that the prior treatment interventions were unsuccessful "primarily due to [D.T.]'s poor motivation coupled with a lack of consistent family involvement that did not produce sustainable gain."

{¶ 34} On cross-examination, Williams acknowledged that both multisystemic therapy and the Tapestry program require a "high" level of family involvement and that the reason multisystemic therapy was "unsuccessful" was not attributable to D.T., i.e., the case was closed due to his mother's mental health issues and lack of response from his grandmother/legal guardian. Williams reported that CCDCFS had referred the family to the Applewood Tapestry program but had minimal success due to inconsistent attendance. She could not state whether the lack of success with the Tapestry program was attributable to D.T. or to his family. Williams agreed that if D.T. were sent to ODYS, he would not be dependent on his family for completion of his therapeutic intervention.

{¶ 35} With respect to "sentencing treatment considerations," Williams identified several "behavioral health needs" of D.T. that "may need to be addressed in the interest of attempting to reduce recidivism," including (1) continuation of mental health services and the monitoring of the psychiatric medication D.T. was taking for "attention issues," (2) cognitive behavioral and anger management

programming to assist D.T. with dysfunctional thinking and oppositional behaviors, (3) further assessment and services to address D.T.'s chemical dependency issues and (4) a psychoeducational assessment to determine if literacy or behavioral issues negatively impacted D.T.'s academic performance.

{¶ 36} The State also presented testimony from each of the five victims. Katherine Ives testified that she was exiting the parking garage of her apartment building in Little Italy in Cleveland during the late afternoon on December 19, 2021 when a male "grab[bed] [her] sides" and said, "Give me your keys," while pointing a gun at her stomach. Ives handed the male her keys, which were attached to her wallet, and the male asked her for the codes for her debit cards. Ives told the male that she did not have any debit cards in her wallet. The male asked Ives if that was all the money she had and she said, "Yes." The male then drove off in her car, a 2015 or 2016 Audi Q3. Police recovered the vehicle, but it was totaled. The vehicle was insured, and Ives was compensated for the damage to the vehicle. Ives testified that due to her continuing anxiety, she has not driven since the incident and lost two of her three jobs because she can no longer drive to them. Ives was 20 at the time of the incident.

{¶ 37} Ya Goa testified that at approximately 9:00 p.m. on December 21, 2021, she was sitting in her vehicle, a 2015 Mercedes, in Little Italy, trying to get the vehicle's navigation system to work, when a male suddenly opened her car door, pointed a gun at her and forced her out of the vehicle. She testified that another male circled around the front of the vehicle and entered it from the passenger's side.

That male pointed a gun at her and told her to log out of her Apple id, remove her password from her phone and give him her phone. The male told her that if she did not do this quickly, he would shoot her. The male asked Goa if she had any money and she said, "No." The male drove off in her car, which contained her wallet. Goa stated that the male used the information from her phone and wallet to access her bank account and her Amazon, DoorDash and Ebay accounts, to purchase various items using her accounts and to apply for credit cards. When police recovered her vehicle, there was significant damage to it, and it took several months for the vehicle to be repaired. As a result of the incident, Goa suffered more than $9,000 in out of-pocket losses. Goa testified that she was "upset" and "devastated" as a result of the incident, that for months she was afraid to go out at night, that she had flashbacks regarding the incident and that she still cannot sit alone in her car. At the time of the incident, Goa was 21 and an international student at Case Western Reserve University.

{¶ 38} Elena Donofrio testified that on December 25, 2021, she was parking her car and gathering her belongings, getting ready to enter her building, when she was approached by a male with a gun who said, "I'll shoot you if you don't give me your car." Donofrio asked if she could get her house key off her key fob, removed her house key, then said, "I'm taking my bag too," and ran off. Donofrio stated that she was about to walk into the door of her building when the male got out of the vehicle, approached her, pointed a gun at her, and asked her how to start the vehicle. Donofrio told him how to start the vehicle, then ran inside. When police recovered

the vehicle, there was significant damage to it. Donofrio stated that she had over $20,000 in out-of-pocket losses because insurance did not cover the damage. She stated that, as a result of the incident, she is "like on edge always" and got a gun. At the time of the incident, Donofrio was 26 or 27.

{¶ 39} Ross Guidotti testified that on the early morning of December 26, 2021, he was sitting in his vehicle, a 2019 Honda CRV, in the parking garage for Target in University Heights. A male opened his car door, pointed a gun at Guidotti and told him to give him his keys. Guidotti stated that he told the male he did not have any keys because it was a push-to-start vehicle. The male then said, "Give me your keys, I'm gonna shoot you." Guidotti replied, "No, you're not," fell back into his seat, "slam[med] it into drive" and drove away as quickly as he could. Guidotti stated that the incident still has him "shooken up," that he has taken self-defense classes, that he now waits until daylight to shop and that he "stay[s] away from parking garages at all costs." Guidotti was 28 at the time of the incident.

{¶ 40} Francis Collins testified that on December 27, 2021, she was sitting in her vehicle, a 2019 Volkswagen Jetta, on Random Road in Little Italy, grabbing a few items from her backseat before she entered her boyfriend's apartment when a male approached her from the rear of her vehicle. The male "had a gun brandished in front of him the entire time," and asked her for her keys. Collins gave him her keys. He asked her if she had any money, she said, "No," and he said, "Okay." The male then asked her if she needed anything out of her car and she said, "Sure." She

grabbed a few things out of the vehicle, including her purse. The male offered to carry her stuff inside but Collins refused.

{¶ 41} Collins testified that the male was in her car with her keys in his right hand and that they "were just kind of looking at each other." She stated that she "wasn't really ready for him to leave," so she approached him and "made a reach to grab [the keys]" from him. She testified that "there was a lot of noise and [she] felt a lot of warmth in [her] leg." Collins stated that the male shot her in the upper left thigh and stomach. The male then got out of the car, took her purse and drove away. Collins testified that it took several months for her wounds to heal, that she was afraid to go outside at night and that she was stressed, anxious and had difficulty sleeping for fear of "something like that happening again." When police recovered her vehicle, there was significant damage to it. As a result of the incident, Collins sustained over $1,200 in damages in addition to amounts paid by insurance to repair her vehicle. At the time of the incident, Collins was a 21- or 22-year-old law student at Case Western Reserve University.

{¶ 42} Shucofsky, who was then a detective with the Cleveland Police Department, testified that she was assigned to investigate the shooting of Collins. She stated that after locating video footage of the incident, Cleveland police identified D.T. as a suspect. Shucofsky testified that the multiple carjackings made the community "very nervous" and that Little Italy was "an easy target area" given that a lot of young college students and international students lived in the area. Shucofsky stated that after D.T. was arrested, she interviewed him and he admitted

to having been involved in four aggravated robberies in Cleveland, all of which involved the use of a firearm. She indicated that D.T.'s manner was "very nonchalant" and that he did not seem remorseful. Shucofsky could not recall how long D.T. was interviewed or whether a parent or lawyer was with him at the time of the interview.[3]

**D.T.'s Witnesses**

{¶ 43} Zavatchen testified that she had been working with D.T. since he was remanded to the juvenile detention center on December 29, 2021. She indicated that D.T. is currently on Level 1 or 2 — a "medium" level — of the juvenile detention center's behavior management plan. Zavatchen indicated that D.T. had been involved in fight in May 2022 but that, otherwise, he had had no issues while in the juvenile detention center. With respect to the incident in which D.T. reportedly exposed himself to a female staff member, Zavatchen stated that it was her understanding that "the incident took place when he was in his room, like laying down and a staff [member] happened to peek in."

{¶ 44} Zavatchen testified that when school is in session, D.T. was in school for most of the day, with an hour of gym time and sometimes afternoon programming. She stated that D.T. was "pretty consistent," that he had "matured" in the eight months he had been at the detention center, that staff described him as

---

[3] In addition to the witness testimony, the State introduced Williams' report, surveillance video footage of the incidents involving Donofrio and Collins and photos of Collins' injuries. It is unclear from the record whether these exhibits were ever admitted into evidence. Aside from Williams' report, they were not included in the record forwarded to this court on appeal.

"respectful, polite, kind, things like that" and that he was "able to step back" and "stay out" of a lot of issues others had in the detention center. Zavatchen stated that she had only worked with D.T. while he was in the juvenile detention center and not while he was out in the community but that, in her experience, D.T. did well while he was in a controlled environment like the juvenile detention center.

{¶ 45} Zavatchen indicated that when D.T. had been in Pod B, his teacher had described him as a "very hard worker." She stated that although she had not received an updated progress report since D.T. had been moved to Pod C, she "imagine[d] nothing's changed." She indicated that D.T. had recently participated in a detention center program about making better choices and that he had passed it.

{¶ 46} Zavatchen testified that visitation was every Saturday and that D.T.'s mother, father and paternal grandmother had visited D.T. at the detention home.

{¶ 47} D.T.'s adult half-sister, Melissa Dixon, testified that she has a "good relationship" with D.T. and that he and her daughter, who is six months apart in age, "grew up together." Dixon stated that she has three children ages 14, 10 and 2 and they have no criminal background.

{¶ 48} Dixon testified that she believes that D.T. "has it in him to change," that programming would help him and D.T. had not had an opportunity to get treatment while he was in the community "probably because of their mother." She explained that their mother has "a lot of mental health problems," and that, as a result, she is "really not able to like be there constantly like as much as [D.T.]

probably needs her to." Dixon indicated that she had, at times, "stepped up" to "be a parent" to D.T. when her mother was not acting as a parent. Dixon stated that if her brother were returned to the community, she would be there to help him to the extent she was able. Dixon indicated that she had never been contacted by the juvenile court diagnostic clinic about D.T. and had not been responsible for organizing multisystemic treatment therapy for D.T.

{¶ 49} When asked to describe D.T.'s level of maturity, Dixon replied, "He has some sense, but I think he can have more." She stated that he was not more mature than the average 14-year-old, i.e., that he was just "a regular kid," and she was surprised that D.T. ended up in the juvenile detention center.

{¶ 50} D.T.'s mother, Florence Daniels, testified that she has posttraumatic stress disorder due to a traumatic event that occurred when she was seven months' pregnant with D.T. Daniels described her mental health issue as a "nervous condition": "Sometimes I'm quiet. Sometimes I move faster — like my body moves faster than my brain when there's a whole bunch happening." She stated that she had been on medication for mental health issues since 2008 and currently takes six different medications to attempt to control her mental health.

{¶ 51} Daniels acknowledged that she had never returned Williams' calls from the juvenile court diagnostic clinic regarding D.T. and stated that there were a number of "miscommunication" issues for which she was not responsible that precluded D.T. from participating in programming. She explained:

Q. . . . Earlier today we heard testimony that you [did] not follow through with something called MST so [D.T.] wasn't able to engage in that. Is that accurate?

A. Well, I think it was a lack of miscommunication [sic] where they were mailing me some stuff and we didn't live at that address. We had moved from there for like four years.

Q. Did you call the Court and make them aware of your new address?

A. Well, I winded up calling Miss Capers after they were like they can't get in touch with me.

Q. To your knowledge is it [D.T.'s] fault that he didn't complete that MST?

A. No, because it was a lack of communication I strongly believe. But I had gave them my number and my mom's number. My mom doesn't answer her phone all the time, so I was trying to like listen to voicemails a lot, but I had so many voicemails I probably missed a couple voicemails, but no, it wasn't his fault.

Q. What about Tapestry or Tapestries?

A. Tapestry, I don't know what was going on — something was going on with Tapestry. It had to be like a miscommunication because the lady didn't get in touch with me, but I had seen her twice when she visited at my mom's house. I was at work. I did work a lot, I have to admit that, but the time — the couple times that she came I was on FaceTime when she was there, so it wasn't like she didn't see me.

Q. Are you aware of why he was unsuccessfully terminated from Tapestry?

A. Yeah, because they say that I didn't return the calls.

{¶ 52} Daniels testified that D.T. had been staying with Dixon because D.T.'s grandmother, his legal guardian, was elderly and Daniels worked all the time. Daniels testified that she was "kind of shocked" and "confused" to learn that, when D.T. was on house arrest, he had a number of AWOLs. She indicated that when

disciplining D.T., she would "just talk" to him and stated that she had "never been through anything like this" with any of her other children.

{¶ 53} At the conclusion of the amenability hearing, the juvenile court stated:

So for this hearing the Court is required to consider all the discretionary bindover factors under ORC 2152.12(D) and (E), and the Court did consider all of those factors as well as the Court did take into account factors in addition to these that are listed, other information factors the Court had at its disposal.

And based on the information that the Court has and considering all these factors the Court finds that [D.T.] is not amenable to our juvenile justice system.

The factors in favor of transfer outweigh the factors that are against transfer.

So with this finding the Court transfers — this is a discretionary transfer, so the Court will transfer these cases to the Adult Court.

The juvenile court did not identify the "other information factors" it considered in addition to those listed in R.C. 2152.12(D) and (E), did not explain its findings with respect to, its evaluation of, or the weight given, any of the factors it considered and did not discuss the facts or evidence that supported its findings as to any of the factors.

{¶ 54} On September 7, 2022, the juvenile court issued journal entries in which it set forth its findings on the issue of amenability as follows:

The court finds after a full investigation, including a mental examination of said child made by a duly qualified person, and after full consideration of the child's prior juvenile record, family environment, school record, efforts previously made to treat and rehabilitate the child, including prior commitments to the Department of Youth Services, the nature and severity of the offense herein, the age, physical, and mental condition of the victim as effected by the matter herein, and

other matters of evidence, that there are reasonable grounds to believe that the child herein is **not amenable** to care or rehabilitation within the juvenile system.

The court further finds that the safety of the community may require that the child be subject to adult sanctions.

The court considered the relevant factors in favor of transfer pursuant to R.C. 2152.12(D) and makes the following findings:

1. The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

2. The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

3. The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

4. At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

5. The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

6. The child is emotionally, physically, or psychologically mature enough for the transfer.

7. There is not sufficient time to rehabilitate the child within the juvenile system.

The Court considered the relevant factors against transfer pursuant to R.C. 21152.12(E) and finds that no factors apply.

(Emphasis in original.)

{¶ 55} The juvenile court then transferred the cases to the general division for further proceedings.

**Proceedings in the General Division**

{¶ 56} Once D.T. was in the general division, a Cuyahoga County Grand Jury indicted D.T. on 42 counts related to the five incidents: six counts of aggravated robbery (Counts 1, 8, 15, 22, 29 and 30), 15 counts of robbery (Counts 2-4, 9-11, 16-18, 23-25, 31, 32 and 35), six counts of having weapons while under disability (Counts 5, 12, 19, 26, 38 and 39), four counts of grand theft (Counts 6, 13, 20 and 36), one count of attempted grand theft (Count 27), five counts of improperly handling firearms in a motor vehicle (Counts 7, 14, 21, 37 and 42), one count of attempted murder (Count 28), two counts of felonious assault (Counts 33 and 34), one count of tampering with evidence (Count 40) and one count of carrying a concealed weapon (Count 41). The aggravated robbery, robbery, grand theft, attempted grand theft, attempted murder and felonious assault counts included one- and three-year firearm specifications. Several of the other counts included forfeiture of weapon specifications. D.T. initially pled not guilty to all charges.

{¶ 57} At his arraignment on October 12, 2022, the trial court entered orders referring D.T. to the Cuyahoga County Court Psychiatric Clinic (the "court psychiatric clinic") for evaluation and scheduling an initial pretrial conference. The trial court's October 12, 2022 referral order stated, in relevant part:

> Defendant is referred to court psychiatric clinic. Director, psychiatric clinic: In accordance with provisions of the Ohio Revised Code, 2947.06(B) reports for the purpose of determining the disposition of a

case: Eligibility for transfer to mental health court (Defendant has a psychotic disorder or intellectual function below I.Q. of 75). You are directed to examine [D.T.].

The trial court ordered the custodian of records for the Cuyahoga County Jail to provide copies of "all jail records for the current or most recent jail stay" to the court psychiatric clinic "for purposes of competency evaluation."

{¶ 58} After the pretrial conference on October 19, 2022, the trial court issued a second order referring D.T. to the court psychiatric clinic for evaluation:

> Defendant is referred to court psychiatric clinic. Director, psychiatric clinic: In accordance with provisions of the Ohio Revised Code, 2945.371 competence to stand trial; etc. 2947.06(B) reports for the purpose of determining the disposition of a case: Eligibility for transfer to mental health court (Defendant has a psychotic disorder or intellectual function below I.Q. of 75). You are directed to examine [D.T.].

Once again, the trial court ordered the custodian of records for the Cuyahoga County Jail to provide copies of "all jail records for the current or most recent jail stay" to the court psychiatric clinic "for purposes of competency evaluation."[4]

{¶ 59} On November 7, 2022, D.T. was evaluated by Dr. Jacqueline Heath ("Heath"), a forensic psychologist at the court psychiatric clinic. In her report, dated November 7, 2022, Heath opined that D.T. "currently presents with signs and symptoms" of adjustment disorder with depressed mood and cannabis use disorder, mild, in sustained remission in a controlled environment. She further opined that

---

[4] The transcripts from D.T.'s arraignment on October 12, 2022 and the initial pretrial conference on October 19, 2022 were not included in the record on appeal. Accordingly, it is unknown what, if anything, in particular occurred during those proceedings that led the court to request a second competency evaluation of D.T.

D.T. "currently" has "the capacity to understand the nature and objectives of the proceedings against him and to assist in his defense" and that, "[b]ecause he does not have an I.Q. score below 75 and does not have a psychotic disorder diagnosis, he would not be eligible for transfer to the Mental Health Court Docket." Based on the record before us, it does not appear that the issue of D.T.'s competency was raised again by the trial court or the parties until the parties reached a plea agreement on March 20, 2023.

{¶ 60} At the outset of the change-of-plea hearing, the State requested that a stipulation to the findings of Heath's report be placed on the record:

> THE COURT: . . . I understand that there is an opportunity here for a change of plea? . . . Would you please put that on the record?
>
> MS. HASAN: Yes, Your Honor. And just prior to that, I believe there was previously a competency report done, and the parties stipulated on November 17, 2022. And the State would just like to place that stipulation on the record as well. . . .
>
> THE COURT: All right. I have before me a hearing — a report from the court psychiatric clinic that is dated November 7, 2022. That is penned by Dr. Jacqueline Heath, a forensic psychologist. Counsel for the defense, have you had the opportunity to review this report?
>
> [DEFENSE COUNSEL]: I have, Your Honor.
>
> THE COURT: Do you stipulate to the findings of this report?
>
> [DEFENSE COUNSEL]: I do, Judge.
>
> THE COURT: And on behalf of the State of Ohio, do you stipulate to the findings of the report?
>
> MS. HASAN: Yes, Your Honor.
>
> THE COURT: You may proceed.

No further inquiry or findings were made by the trial court as to D.T.'s competency nor did the trial court accept the stipulations.

{¶ 61} Pursuant to the parties' plea agreement, D.T. agreed to plead guilty to five amended counts of aggravated robbery in violation of R.C. 2911.01(A)(1), first-degree felony, each with three-year firearm specifications (amended Counts 1, 8, 15, 22 and 29); one amended count of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony (amended Count 34); one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony, with a weapon forfeiture specification (Count 38) and one count of carrying concealed weapons in violation of R.C. 2923.12(A)(1), a third-degree felony, with a weapon forfeiture specification (Count 40). The parties further agreed to a recommended minimum sentencing range of 18 to 25 years and that all firearm specifications were from different acts or transactions and must be run consecutively pursuant to R.C. 2929.14(C)(1)(a). In exchange for his guilty pleas, the remaining counts were nolled.

{¶ 62} In June 2023, the trial court "adopted the parties' recommended agreed sentencing range" and sentenced D.T. to an aggregate prison sentence of 21 to 24 years as follows: On amended Count 1, the trial court sentenced D.T. to three years on the firearm specification and six-to-nine years on the underlying offense; on amended Counts 8, 15, 22 and 29, the trial court sentenced D.T. to three years on the firearm specification and six years on the underlying offense; on Count 34, the

trial court imposed a two-year sentence and on Counts 38 and 40, the trial court imposed a one-year sentence. The trial court ordered that the sentences on the five firearm specifications be served consecutively (15 years) and prior to the sentences on the underlying offenses and that the sentences on the underlying offenses be served concurrently to one another (six to nine years). The trial court also imposed postrelease control.

{¶ 63} [D.T.] appealed, raising the following two assignments of error for review:

Assignment of Error I:

[D.T.'s] statutory rights were violated when both the juvenile court and adult court failed to hold a hearing to determine his competency and failed to issue a written competency determination, in violation of R.C. 2152.58 and R.C. 2945.37, the Fourteenth Amendment to the United States Constitution, and Article I, Section 16 of the Ohio Constitution; *In re K.A.*, 8th Dist. Cuyahoga No. 107938, 2017-Ohio-6979, ¶ 10-19; *State v. Bennett*, 8th Dist. Cuyahoga No. 107078, 2019-Ohio-2213, ¶ 21. (2/17/2022 Journal Entry; 6/13/2022 T. p. 12; 8/30/2022 T. p. 15; 10/11/2023 Journal Entry; 3/20/2023 T. p. 37).

Assignment of Error II:

The juvenile court abused its discretion when it transferred [D.T.'s] case for criminal prosecution, without sufficient credible evidence of non-amenability, in violation of R.C. 2152.12(B); the Fifth and Fourteenth Amendments to the United States Constitution; and Article I, Section 16 of the Ohio Constitution; *State v. Nicholas*, 171 Ohio St. 3d 278, 2022-Ohio-4276, 217 N.E.3d 745, ¶ 3.

**Law and Analysis**

{¶ 64} As the United States Supreme Court has long held, due process protections must be afforded to children. *See, e.g., In re Gault*, 387 U.S. 1, 30-31 (1967); *see also State v. Aalim*, 2017-Ohio-2956, ¶ 23 ("Due-process rights are

applicable to juveniles through the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.").

{¶ 65} Few, if any, determinations are more significant in the life of an accused juvenile offender than whether he or she will be tried in an adult court. *See, e.g., State v. Smith*, 2022-Ohio-274, ¶ 21 ("'The transfer hearing implicates far more significant issues than the venue or forum of trial; it serves as a vehicle by which a child offender is deprived of the rehabilitation and treatment potential of the juvenile-justice system.'"), quoting *Aalim* at ¶ 73 (O'Connor, C.J., dissenting). Because of the "tremendous consequences" following a decision that a child must lose the protections of the juvenile system and face trial as an adult, a bindover proceeding — a "critically important" stage in juvenile proceedings — must "measure up to the essentials of due process and fair treatment." *Kent v. United States*, 383 U.S. 541, 553-554, 556, 560-562 (1966); *see also In re D.M.*, 2014-Ohio-3628, ¶ 11; *In re D.R.*, 2022-Ohio-4493, ¶ 14 (Juvenile procedural due process claims are examined "through a framework of fundamental fairness."), citing *In re C.P.*, 2012-Ohio-1446, ¶ 72. Given that "the General Assembly has vested the juvenile courts with exclusive jurisdiction over juvenile cases, . . . juveniles are statutorily entitled to some procedure." *In re D.R* at ¶ 18, citing *Kent* at 557.

{¶ 66} As the Ohio Supreme Court stated in *Smith*:

> Ohio juvenile law is organized around the tenet that children who are charged with acts that would be felonies if committed by adults must be recognized by courts as children when adjudicating and determining

the consequences to be imposed on them if they are found to have committed those acts. In the statutory scheme for juvenile justice, "[i]nstead of 'defendants,' children are 'respondents' or simply 'juveniles'; instead of a trial, children receive 'hearings'; children are not found guilty, they are 'adjudicated delinquent'; and instead of sentencing, children's cases are terminated through 'disposition.'" *State v. Hanning*, 89 Ohio St.3d 86, 89, 728 N.E.2d 1059 (2000). Legislatures and courts, including this court, have recognized that the special interests involved in juvenile cases cannot be adequately addressed by the adult criminal-justice system, but they have also recognized that juveniles accused of crimes must be afforded the same procedural-due-process protections as adult criminal defendants . . . .

"[J]uvenile law and criminal law are not synonymous," *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E.3d 448, ¶ 13[.] . . . "[T]he very purpose of the state juvenile code is 'to avoid treatment of youngsters as criminals and insulate them from the reputation and answerability of criminals,'" *id.* at ¶ 19, quoting *In re Agler*, 19 Ohio St.2d 70, 80, 249 N.E.2d 808 (1969). Stated another way, the juvenile-justice system must provide for accountability; yet it must also meet society's need to secure its future through its youth. Thus, the juvenile-justice system must hold juveniles accountable for their actions and, whenever possible, provide them with opportunities for learning and growth toward a better path.

*Smith* at ¶ 1-2.

{¶ 67} As set forth in R.C. 2152.01(A), the "overriding purposes" for juvenile dispositions are "to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender." These purposes are to be achieved "by a system of graduated sanctions and services." *Id.* "We should respect those stated statutory purposes when examining, applying, and, when necessary, interpreting the statutes for juvenile bindovers for prosecution in adult court." *Smith* at ¶ 2.

{¶ 68} To that end, R.C. Chapters 2151 and 2152 are to be "liberally interpreted and construed" "[t]o provide judicial procedures" through which their provisions are "executed and enforced" and in which "the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced." R.C. 2151.01; 2152.01(C). "Judicial discretion is essential to preserving that special nature of the juvenile process and to maintaining fundamental fairness in the juvenile-justice system." *In re D.R.* at ¶ 15. "To ensure that orders are 'reasonably calculated to achieve the overriding purposes' of the statutes that govern the juvenile-justice system, R.C. 2152.01(B), juvenile courts must evaluate the particular facts and circumstances of each case and discern the particular problems and needs of the juvenile appearing before them." *Id.* "A juvenile court's ability to individually assess and treat juvenile offenders is a key element to maintaining fairness in our juvenile-justice system. So, too, is shielding juveniles from carrying the consequences and stigma of their juvenile delinquency into adulthood." *Id.* at ¶ 5.

{¶ 69} It is against this backdrop that we review the assignments of error raised in this appeal.

### Whether D.T.'s Guilty Pleas in Adult Court Waived Any Appealable Errors

{¶ 70} Before we turn to the merits of D.T.'s assignments of error, we first address the State's contention that D.T. waived any appealable errors by entering guilty pleas to various offenses after he was bound over to adult court. The State

asserts that D.T. waived all errors claimed in this appeal, including any errors related to the failure to comply with competency statutes and any errors in the juvenile court's "discretionary consideration of amenability factors," "as none of the alleged errors cited precluded him from entering a knowing and voluntary plea."

{¶ 71} In response, D.T. asserts that the State's argument puts the cart before the horse — i.e., that "it is precisely the court's failure to comply with the [competency] statute that prevented [D.T.] from entering a knowing, intelligent, and voluntary plea" — and points out that this court has previously evaluated lower courts' compliance with statutory competency procedures on appeal following a defendant's or a delinquent child's guilty plea (citing *In re K.A.* 2017-Ohio-6979, ¶ 10-19 (8th Dist.), and *State v. Dowdy*, 2012-Ohio-2382, ¶ 15 (8th Dist.)), and "routinely decides challenges to amenability decisions following a child's guilty plea in adult court" (citing *State v. Jordan*, 2023-Ohio-311, ¶ 12 (8th Dist.), *State v. Carter*, 2023-Ohio-4310, ¶ 18 (8th Dist.), and *State v. Walker*, 2024-Ohio-729, ¶ 14 (8th Dist.)). (Emphasis deleted.) D.T. also asserts that the juvenile court's failure to comply with the juvenile competency statutes and requirements for determining amenability deprived the adult court of jurisdiction, which could not be waived by D.T.'s guilty pleas in adult court.

{¶ 72} "[A]bsent a proper bindover procedure . . ., the juvenile court has the exclusive subject matter jurisdiction over any case concerning a child who is alleged to be a delinquent." *State v. Wilson*, 73 Ohio St.3d 40, 44-46 (1995). A court's subject-matter jurisdiction cannot be waived — even by the entry of a guilty plea.

However, not every error in a bindover proceeding is a jurisdictional error. *See, e.g., Smith v. May*, 2020-Ohio-61, ¶ 31 ("'[N]ot every requirement [in R.C. 2152.12], even if mandatory, is jurisdictional in nature.'"), quoting *Pryor v. Dir., Dept. of Job & Family Servs.*, 2016-Ohio-2907, ¶ 15.

{¶ 73} In support of its waiver argument, the State cites cases in which this court and the Ohio Supreme Court have held that a voluntary guilty plea in adult court waives the ability to challenge the ruling on a pretrial suppression motion, *State v. Obermiller*, 2016-Ohio-1594, ¶ 56, to claim his or her statutory speedy trial rights were violated, *State v. Kelley*, 57 Ohio St.3d 127, 130 (1991), or to claim ineffective assistance of counsel, unless the plea was induced by that ineffective assistance, *State v. Geraci*, 2015-Ohio-2699, ¶ 14 (8th Dist.). None of these cases involved failure to make a competency determination or a discretionary transfer from juvenile court.

{¶ 74} The State also cites cases from other appellate districts in which courts have recognized that a juvenile's guilty plea in adult court "'waives the ability to contest the sufficiency and weight of the evidence presented at the probable cause hearing in the juvenile court,'" Appellee's Br. at 16, quoting *State v. Zarlengo*, 2021-Ohio-4631, ¶ 46 (7th Dist.), and citing *State v. Powell*, 2021-Ohio-200, ¶ 55 (4th Dist.) (defendant waived claim that juvenile court's probable cause finding was not supported by sufficient evidence, claim of ineffective assistance of counsel based on counsels' failure to adequately prepare for probable cause hearing and any errors in juvenile court's failure to appoint a criminal investigator, denial of motion to

suppress and colloquy regarding waiver of amenability hearing when he entered guilty pleas in adult court after bindover; "[i]f an error in a bindover proceeding is nonjurisdictional, it can be waived by a voluntary guilty plea or forfeited by the failure to preserve it in the juvenile court proceedings").[5] This case is different.

{¶ 75} First, a challenge based on a lower court's failure to hold a competency hearing or make a competency determination "goes directly" to whether a defendant's plea was voluntary, knowing, and intelligent. *See, e.g., In re K.A.*, 2017-Ohio-6979, at ¶ 19, fn. 2 (8th Dist.) (juvenile's plea did not waive a challenge to the juvenile court's failure to conduct required competency hearing when the issue was raised before juvenile admitted to rape and kidnaping charges because challenge went "directly to whether his plea was voluntary, knowing, and intelligent"); *see also State v. Allen*, 2020-Ohio-4444, ¶ 15 (8th Dist.).

{¶ 76} Second, errors related to the juvenile court's failure to comply with mandatory procedures designed to ensure the competency of a juvenile offender —

⁵ The State asserts that "[w]hether a guilty plea waives claims relating to the juvenile transfer hearing is an issue currently pending in the Supreme Court." Appellee's Br. at 16, citing *State v. Turner*, No. 2023-1242, Proposition of Law II. In *Turner*, this court held that a juvenile court's failure to make a finding of probable cause for a charge that was transferred to adult court could not be waived by virtue of a defendant's guilty plea in adult court because the issue was jurisdictional. *State v. Turner*, 2023-Ohio-2874, ¶ 10, 23 (8th Dist.) No issues were raised regarding competency or the juvenile court's amenability determination. The State appealed that decision to the Ohio Supreme Court, which accepted the appeal for review. Proposition of Law II specifically addresses only alleged errors in the juvenile court's probable-cause finding, not alleged errors in a juvenile court's determination of competency or amenability. Accordingly, it is not clear that any ruling in that case would resolve the issues here. Proposition of Law II states: "In juvenile bindover cases, guilty pleas in criminal court waive claims arising out of the underlying bindover hearing because a grand jury determination superseded the juvenile court's probable cause finding."

which had been called into question during proceedings in juvenile court — or related to deficiencies in the juvenile court's amenability determination are very different from a challenge to the factual or evidentiary basis for a juvenile court's probable-cause determination. Such defects in the juvenile court's bindover proceedings do not relate to an offender's factual guilt. While a defendant, when entering a guilty plea in adult court, admits committing the acts that constituted the offenses to which he pleads guilty (and which were the subject of the juvenile court's probable-cause determination), he does not make any admission as to his competency during prior juvenile proceedings or that he was not amenable to care or rehabilitation in the juvenile justice system.

{¶ 77} In *State v. Pickens*, 2024-Ohio-951 (8th Dist.), the defendant appealed his convictions for involuntary manslaughter and improper discharge of a firearm at or into habitation or school after his case was transferred to adult court and he pled guilty to the offenses. *Id.* at ¶ 1, 4-5. On appeal, the defendant challenged the sufficiency of the evidence that supported the juvenile court's probable-cause determination, claiming that there was insufficient evidence that he shot the weapon into the victim's home. *Id.* at ¶ 14. This court held that there could be no reversible error in the juvenile court's probable-cause determination because the defendant's subsequent admissions through his guilty pleas "subsume[d] the quantum of evidence necessary to the probable-cause determination." *Id.* at ¶ 15. The court explained:

The probable-cause determination is a preliminary, sufficiency determination requiring the state to present evidence that raises more than mere suspicion of guilt — but that need not rise to the level of beyond a reasonable doubt. *In re E.S.*, Slip Opinion No. 2023-Ohio-4273, at ¶ 23.

The effect of a guilty plea is a complete admission of guilt to the offense to which the plea is entered, which goes well beyond proof beyond a reasonable doubt if a guilty plea is to be quantified. Crim.R. 11(B)(1). . . . Pickens entered his guilty plea and the effect of that plea is a complete admission to committing the acts that constituted the offenses to which he pleaded guilty.

Pickens's guilty plea to improper discharge of a firearm into a habitation . . . was based on the same facts underlying the probable-cause determination. . . . His guilty plea effectively concedes there was sufficient evidence of his committing acts that would constitute the felony offenses, . . . and as a result, there can be no error with the juvenile court's factual determination. *See, e.g., State v. Griggs*, 103 Ohio St.3d 85, 2004-Ohio-4415, 814 N.E.2d 51, ¶ 19 (guilty plea subsumes an admission of guilt, and therefore, the guilty plea is an admission to committing the underlying acts on which the conviction is based).

*Pickens* at ¶ 16-18.

{¶ 78} In *Pickens*, as in this case, the State argued that a defendant bound over to the general division cannot raise any nonjurisdictional error relating to that bindover on appeal after pleading guilty to the offenses for which the defendant was bound over. *Id.* at ¶ 14, 19. This court, however, rejected the State's attempt to seek "a definitive, bright-line rule that an offender waives all nonjurisdictional errors in the juvenile proceedings after the case is transferred to the general division if the offender pleads guilty to the felony offenses," concluding that it "need not reach that broad of a conclusion" in resolving the case. *Id.* ("[W]e do not take any position on the applicability of that general principle [i.e., that pleading guilty waives all

nonjurisdictional defects in the proceedings that occur prior to the plea] to other aspects of an appeal involving bindover and guilty plea."), citing *Jordan*, 2023-Ohio-311, at ¶ 7 (8th Dist.) (after a discretionary bindover and pleading guilty, defendant unsuccessfully challenged amenability determination on appeal); *see also State v. Walker*, 2024-Ohio-729, ¶ 26-27 (8th Dist.) (declining to address the issue of whether defendant waived his right to challenge the sufficiency of the evidence supporting the juvenile court's amenability finding by entering guilty pleas in adult court because it found the juvenile court's amenability finding was supported by sufficient information in the record); *State v. Poole*, 2012-Ohio-5739, ¶ 1, 8-26, fn. 1 (8th Dist.) (when addressing defendant's claims that juvenile court should not have ordered his discretionary transfer to the general division because (1) the juvenile court failed to state its specific reasons in support of bindover on the record and (2) the juvenile court abused its discretion by finding the amenability factors set forth in R.C. 2152.12(D) justified his transfer, noting "[a] guilty plea made following a bindover or transfer from the juvenile division does not waive the right to appeal the bindover or transfer"). *But see State v. Moore*, 2022-Ohio-460, ¶ 24 (4th Dist.) (By pleading guilty to offenses in adult court, defendant waived alleged nonjurisdictional errors challenging the juvenile court's exercise of its discretion finding probable cause that defendant committed offenses and concluding that defendant was not amenable to rehabilitation within the juvenile justice system).

{¶ 79} There are other considerations as well. The Ohio Supreme Court has held that a defendant may not immediately appeal a juvenile court's order

transferring jurisdiction of his or her case to adult court but must wait to appeal any error stemming from the order until it becomes a final judgment, following conviction and sentencing, in the general division. *See In re D.H.*, 2018-Ohio-17, ¶ 1, 22; *In re Becker*, 39 Ohio St.2d 84 (1974), syllabus. We do not believe a defendant must choose to go to trial, rather than enter a guilty plea, in order to preserve his or her right to challenge errors in the juvenile court's handling of competency issues or its amenability determination. *See Smith v. May*, 2020-Ohio-61, ¶ 29 ("Juveniles facing bindover to an adult court maintain the right to object to a juvenile court's noncompliance with bindover procedures and the right to appeal from any error in the ordinary course of law.")(emphasis deleted).

{¶ 80} Based on these considerations, we find that D.T.'s guilty pleas in adult court do not preclude us from considering on appeal the issues he has raised with the juvenile court proceedings in this case. We need not decide and, therefore, do not decide whether such alleged errors are the type of errors that would deprive the adult court of jurisdiction.

### Juvenile Court's Failure to Hold Competency Hearing and Make Competency Determination

{¶ 81} In his first assignment of error, D.T. contends that his statutory and constitutional rights were violated when (1) the juvenile court failed to hold a competency hearing and issue a written competency determination, as required under the juvenile competency statute, R.C. 2152.58, and (2) the adult court accepted D.T.'s guilty pleas and convicted him without following the statutory

procedures set forth in the adult competency statute, R.C. 2945.37.  D.T. contends that continuing to hold proceedings, when an issue has been raised regarding a child's competency, without first determining that child's competency is a structural error that requires reversal of his bindover and remand to the juvenile court for a new competency evaluation and determination.

{¶ 82} "Fundamental to our adversarial system of justice is the due process right of a criminal defendant who is legally incompetent not to be subjected to trial." *State v. Were*, 94 Ohio St.3d 173, 174 (2002); *see also State v. Thomas*, 2002-Ohio-6624, ¶ 36 ("Fundamental principles of due process require that a criminal defendant who is legally incompetent may not be tried.").  This principle applies with equal force to juvenile offenders.  *See, e.g., In re K.A.*, 2017-Ohio-6979, at ¶ 10 (8th Dist.) ("[T]he right not be tried or convicted while incompetent is as fundamental in juvenile proceedings as it is in criminal trials of adults.'") (Bracketed text in original.), quoting *In re Bailey*, 2002-Ohio-6792, ¶ 10 (2d Dist.); *see also In re A.H.*, 2018-Ohio-364, ¶ 12 (12th Dist.).

{¶ 83} R.C. 2152.51 through R.C. 2152.59 govern juvenile competency determinations.  R.C. 2152.52(A)(1) states: "In any proceeding under this chapter other than a proceeding alleging that a child is an unruly child or a juvenile traffic offender, any party or the court may move for a determination regarding the child's competency to participate in the proceeding."  "[C]ompetency" refers to "a child's ability to understand the nature and objectives of a proceeding against the child and to assist in the child's defense."  R.C. 2152.51(A)(1).  A child is incompetent if, "due

to mental illness, due to developmental disability, or otherwise due to a lack of mental capacity, the child is presently incapable of understanding the nature and objective of proceedings against the child or of assisting in the child's defense." *Id.* It is "rebuttably presumed" that a child does not have a lack of mental capacity if the child is: (1) fourteen years of age or older and (2) not otherwise found to have a mental illness or developmental disability. R.C. 2152.52(A)(2).

{¶ 84} If a party requests a competency determination of a child, the juvenile court may (1) declare the child incompetent, (2) determine that there is a reasonable basis to conduct a competency evaluation or (3) hold a hearing to determine whether there is a reasonable basis to conduct a competency evaluation. R.C. 2152.53(A)(3). If the juvenile court determines there is a reasonable basis to conduct a competency evaluation (or the prosecuting attorney and the child's attorney agree to the evaluation), the juvenile court "shall order a competency evaluation" and appoint a qualified evaluator. R.C. 2152.53(B); R.C. 2152.54. The evaluator is required to "assess whether the individual, in conjunction with advice from legal counsel, is capable of assisting counsel, understanding those things necessary for a proper defense, and for the individual to make informed decisions." *In re S.D.*, 2014-Ohio-2528, ¶ 21 (8th Dist.).

{¶ 85} After the competency evaluation is completed, the evaluator must submit a written competency assessment report to the juvenile court that includes the evaluator's opinion "as to whether the child, due to mental illness, due to developmental disability, or otherwise due to a lack of mental capacity, is currently

incapable of understanding the nature and objective of the proceedings against the child or of assisting in the child's defense." R.C. 2152.56(A); R.C. 2152.57(A). Specifically, the report must address the child's capacity to: (1) comprehend and appreciate the charges or allegations against the child; (2) understand the adversarial nature of the proceedings, including the role of the judge, defense counsel, prosecuting attorney, guardian ad litem or court-appointed special assistant and witnesses; (3) assist in the child's defense and communicate with counsel and (4) comprehend and appreciate the consequences that may be imposed or result from the proceedings. R.C. 2152.56(B).

{¶ 86} After receiving the evaluator's competency assessment report, R.C. 2152.58 mandates that the juvenile court "hold a hearing to determine the child's competency to participate in the proceeding" and thereafter "make a written determination as to the child's competency or incompetency based on a preponderance of the evidence." R.C. 2152.58(A) and (D)(1). In determining the competency of the child to participate in the proceeding, the juvenile court "shall consider the content of all competency assessment reports admitted as evidence" and may also consider "additional evidence, including the court's own observations of the child's conduct and demeanor in the courtroom." R.C. 2152.58(C).

{¶ 87} In this case, a competency evaluation was conducted on March 21, 2022 and a competency evaluation report dated March 23, 2022 was, at some point, apparently submitted to the juvenile court. However, there is nothing in the record to indicate that the juvenile court ever reviewed the report. The juvenile court does

not reference the report in any journal entry and makes no mention of it during the June 13, 2022 probable cause hearing (at which D.T. stipulated to probable cause) or the August 30, 2022 amenability hearing.

{¶ 88} There is no indication in the record that defense counsel stipulated to the report or to any of the findings set forth in the report. No hearing was held on the issue of D.T.'s competency, and no written findings were made by the juvenile court regarding his competency as required under R.C. 2152.58.

{¶ 89} The State concedes that the juvenile court never held a competency hearing and never issued a written determination regarding D.T.'s competency. However, it maintains that "competency" is a matter only for trial i.e., that "[f]undamental principles of due process require that a criminal defendant who is legally incompetent may not be tried" and does not extend to bindover proceedings. The State further asserts that the "competency" of a juvenile offender is "not one of the factors" the juvenile court must consider in determining whether to transfer a case to adult court because "[b]ind-over proceedings are to determine jurisdiction of a case, not the merits of a case triggering competency." The State contends that any error by the juvenile court in failing to hold a competency hearing and issue a written competency determination was harmless because "there was nothing in the record to suggest that [D.T.] lacked competency to stand trial" and both parties "stipulated to the findings of competency" after D.T. was reevaluated when the case was in the general division. We disagree.

{¶ 90} First, there is nothing in R.C. 2152.51 through 2152.58 that limits application of the juvenile competency statutes to competency for trial. R.C. 2152.52(A) states: "*In any proceeding under this chapter* other than a proceeding alleging that a child is an unruly child or a juvenile traffic offender, *any party* or the court *may move for a determination regarding the child's competency to participate in the proceeding.*" (Emphasis added.) R.C. 2152.58(A) states that after receiving the evaluator's competency assessment report, the juvenile court "shall hold a hearing to determine the child's competency to participate *in the proceeding.*" (Emphasis added.) Proceedings relating to a request for discretionary transfer, including probable cause and amenability hearings, are proceedings under R.C. Ch. 2152. *See* R.C. 2152.12.

{¶ 91} In support of its argument that competency was "not an issue that needs to be addressed" prior to transfer to adult court, the State cites this court's decision in *State v. Cruz*, 2010-Ohio-3717 (8th Dist.). In *Cruz*, the juvenile's counsel moved for a full competency evaluation, while the case was pending in juvenile court, based on a "suggestion of incompetency" contained in the psychological assessment report prepared for the defendant's amenability hearing. *Id.* at ¶ 3-4. The juvenile court denied the motion and ruled that the issue of the juvenile's competency could be raised later in juvenile court if jurisdiction was not transferred or in the common pleas court if jurisdiction was transferred. *Id.* at ¶ 4. The case was transferred to the common pleas court and the juvenile again requested a competency evaluation. The trial court referred him to the court psychiatric clinic

for a competency evaluation, but no competency report was ever filed. *Id.* at ¶ 7. The juvenile defendant thereafter pled guilty to several offenses. *Id.* at ¶ 8.

{¶ 92} On appeal, the defendant argued that the juvenile court's failure to address the issue of his competency prior to transferring his case to the common pleas court was an abuse of discretion and constituted reversible error. *Id.* at ¶ 9. The court held that "there was no error in denying [the juvenile's] request for a competency evaluation" while he was in juvenile court, noting that "[t]he proceeding before the juvenile court was an amenability hearing under R.C. 2152.12(B) held to assess the factors for and against transfer of jurisdiction to common pleas court." *Id.* at ¶ 10.

{¶ 93} However, *Cruz* was decided before the enactment of the juvenile competency statute, R.C. 2152.51-2152.59, which became effective on September 30, 2011. At the time *Cruz* was decided, only the adult competency statute existed. *See* R.C. 2945.37(B) ("In a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion."); former R.C. 2945.371(A)("If the issue of a defendant's competence to stand trial is raised . . . the court may order one or more evaluations of the defendant's present mental condition . . . .").

{¶ 94} Further, although the court held that there was no error in the juvenile court's failure to hold a competency hearing before transferring the case to adult court, it reversed the defendant's convictions, and remanded the case with instructions to vacate his pleas and conduct a competency hearing pursuant to R.C. 2945.37, concluding that the common pleas court erred in accepting the defendant's guilty pleas "without holding a hearing on his competency where the issue was raised before trial, both in juvenile court and common pleas court." *Id.* at ¶ 11, 21. The court held that, where the issue of competency is raised, a trial court "cannot make a reliable determination of the defendant's competency to enter a knowing, intelligent, and voluntary plea under Crim.R. 11" without first determining the defendant's competency and that a trial court "commits reversible error" by failing to hold a competency hearing before accepting a guilty plea or make the result of the psychiatric report part of the record where defense counsel did not stipulate to a finding of competency or waive the requirement of a hearing. *Id.* at ¶ 17-18. The court further held that it "could not glean sufficient information from [the] record" to conclude that the error was harmless and that the defendant did not waive a challenge to the trial court's failure to conduct the required competency hearing by his guilty pleas because the issue went "directly to whether his plea was voluntary, knowing, and intelligent." *Id.* at ¶ 19-20.

{¶ 95} This court and others have held that a juvenile court commits reversible error when a juvenile is referred for a competency evaluation and the juvenile court fails to hold a competency hearing and issue a written competency

determination in accordance with R.C. 2152.58. *See, e.g., In re K.A.*, 2017-Ohio-6979, at ¶ 10-19, 22 (8th Dist.) (juvenile court committed reversible error in accepting juvenile's plea; although the juvenile court referred juvenile to the court psychiatric clinic for a competency evaluation, no competency hearing was held, defense counsel did not stipulate to a finding of competency and no written order was entered determining his competency before the juvenile court accepted his guilty plea); *In re A.H.*, 2018-Ohio-364, ¶ 13-15 (12th Dist.) (juvenile court committed reversible error in adjudicating juvenile a delinquent child where it failed to make a written determination of juvenile's competency prior to accepting his admission to a rape charge; fact that defense counsel stipulated that he received the psychologist's written evaluation and was not going to contest the findings did not relieve the juvenile court of its statutory duty to make a written determination as to juvenile's competency); *In re Andrew W.*, 2014-Ohio-1576, ¶ 10-27 (5th Dist.) (juvenile court erred in failing to hold a competency hearing and make a written determination regarding juvenile's competency notwithstanding that court-ordered competency evaluation found him competent where the juvenile had been receiving mental health treatment, had learning and understanding problems and "present[ed] with Borderline Intellectual Functioning").

{¶ 96} Second, contrary to the State's assertion that "there is nothing in the record to suggest that [D.T.] lacked competency," the transcript from D.T.'s arraignment in juvenile court on January 18, 2022, reflects that both D.T.'s mother and defense counsel raised concerns regarding D.T.'s mental state at that time.

Ezzo's competency evaluation report states that D.T.'s competency evaluation was "precipitated by [D.T.'s] parents raising concerns to [D.T.'s] attorney that his mental health was 'diminishing' and upon visiting the juvenile in the Detention Center his defense counsel also had similar concerns that [D.T.] may not be competent to stand trial."

{¶ 97} Although the transcripts from the February 17, 2022 and March 2, 2022 hearings — at which defense counsel requested a competency evaluation of D.T. — are not part of the record forwarded to this court on appeal, the juvenile court apparently believed there were sufficient grounds for concern regarding D.T.'s competency because after defense counsel raised the issue, the juvenile court immediately ordered a competency evaluation of D.T. without first conducting a hearing to determine whether there was a reasonable basis to conduct a competency evaluation. *See* R.C. 2152.53(A)(3).

{¶ 98} At the time of the amenability hearing, D.T. was in the eighth or ninth grade. Testimony at the amenability hearing established that he was functionally illiterate with an "extremely low" reading score. D.T. had limited juvenile court experience, had not previously been subject to bindover and was, in large part, unfamiliar with the issues and court procedures related to those proceedings — proceedings that could expose him to significant prison time if transferred to adult court. Further, the record reflects that there were continued concerns regarding D.T.'s competency after he was transferred to the general division. On October 12, 2022 and October 19, 2022 — shortly after D.T. was transferred to adult court — the

trial court entered two orders referring D.T. to the court psychiatric clinic for evaluation.

{¶ 99} The fact that defense counsel ultimately stipulated to D.T.'s competency at the time of his change-of-plea hearing in adult court in March 2023 does not negate concerns regarding D.T.'s competency, including D.T.'s mental capacity to comprehend and his ability to assist his counsel in his defense in March 2022 through August 2022, when critical decisions were being made in juvenile court, including the decision to waive a probable cause hearing and the juvenile court's decision regarding amenability. R.C. 2152.56(D) and 2152.59 recognize that a juvenile's mental capacity (and competency) may change over time. Where a juvenile is facing the prospect of being bound over to adult court to be tried as an adult court, no one should be left to doubt whether the juvenile was competent during the proceedings.

{¶ 100} R.C. 2152.58(A) and (D)(1) require a juvenile court, after receiving a competency evaluation report, to hold a hearing and make a written determination as to the juvenile's competency. The juvenile court erred in failing to do so. Based on the record before us, we cannot say that this error was harmless. We, therefore, sustain D.T.'s first assignment of error as it relates to the juvenile court's failure to hold a competency hearing and make a written determination of D.T.'s competency.[6]

---

[6] Based on our ruling here and our resolution of D.T.'s second assignment of error below, we need not address D.T.'s first assignment of error as it relates to the general

**Juvenile Court's Decision to Transfer D.T.'s Cases to Adult Court**

{¶ 101} In his second assignment of error, D.T. contends that the juvenile court abused its discretion when it transferred his case to adult court "without sufficient credible evidence of non-amenability."

{¶ 102} Ohio's juvenile courts possess "exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute crimes if committed by an adult." *In re M.P.*, 2010-Ohio-599, ¶ 11, citing R.C. 2151.23(A); *State v. Mays*, 2014-Ohio-3815, ¶ 17 (8th Dist.). Under certain circumstances, however, if a child is old enough and is alleged to have committed an act that would be a felony if committed by an adult, the juvenile court may transfer a case, or bind a juvenile over, to the general division where the juvenile may be tried as an adult and face criminal sanctions. R.C. 2152.10; 2152.12; 2151.23(H); *In re M.P.* at ¶ 11.

{¶ 103} There are two types of transfers in Ohio's juvenile justice system: discretionary transfers and mandatory transfers. *State v. Nicholas*, 2022-Ohio-4276, ¶ 3. With discretionary transfer, the juvenile court has the discretion to transfer to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system and who appear to be a threat to public safety. R.C. 2152.12(B). Mandatory transfer removes discretion from juvenile court

---

division's failure to make a competency determination prior to the entry of his guilty pleas.

judges and requires the transfer of a juvenile to adult court. *Nicholas* at ¶ 3; R.C. 2152.12(A). This case involves discretionary transfer.

{¶ 104} R.C. 2152.12(B) governs discretionary transfer of cases from juvenile court to the general division. After a complaint has been filed charging a child with an offense that would be a felony if committed by an adult, a juvenile court may transfer jurisdiction of the case to the general division if it finds, following a hearing, that (1) the child was 14 years of age or older at the time of the act charged in the complaint, (2) probable cause exists that the child committed the act charged in the complaint and (3) "[t]he child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions." R.C. 2152.12(B)(1)-(3).

{¶ 105} If the juvenile court finds that the age and probable cause elements are met, the juvenile court must order a "full investigation" into "the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination." R.C. 2152.12(C); Juv.R. 30(C).

{¶ 106} After the investigation is complete, the juvenile court holds an amenability hearing to determine whether to exercise its discretion to transfer a juvenile to adult court under R.C. 2152.12(B). In making its determination, the juvenile court must consider all "relevant factors," including specific factors

identified in R.C. 2152.12(D) and (E), that weigh in favor of and against a transfer. R.C. 2152.12(B)(3), (D), (E).

{¶ 107} The specific statutory factors "in favor of a transfer" the juvenile court must consider in determining whether to transfer a child's case to adult court include whether:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

R.C. 2152.12(D). The specific statutory factors "against a transfer" the juvenile court must consider in determining whether to transfer a child's case to adult court include whether:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

R.C. 2152.12(E). R.C. 2152.12(B)(3) requires that the juvenile court record "indicate the specific factors that were applicable and that the court weighed." R.C. 2152.12(B)(3). R.C. 2152.12 is silent with regard to how a juvenile court should weigh the factors in R.C. 2152.12(D) and (E). *See, e.g., State v. Ramsden*, 2021-Ohio-3071, ¶ 23 (12th Dist.); *State v. Marshall*, 2016-Ohio-3184, ¶ 15 (1st Dist.). "There is no requirement that every factor must be 'resolved against the juvenile so

long as the totality of the evidence supports a finding that the juvenile is not amenable to treatment.'" *State v. Bryant*, 2024-Ohio-1192, ¶ 16 (2d Dist.), quoting *State v. Haynie*, 1995 Ohio App. LEXIS 517, *13 (12th Dist. Feb. 13, 1995). "No one factor controls over any other." *Jordan*, 2023-Ohio-311, at ¶ 8, 11 (8th Dist.) ("No one factor under R.C. 2152.12(D) or (E) is outcome determinative.").

{¶ 108} If the juvenile court determines that transfer is warranted, the juvenile court must state the reasons for transfer on the record and in the order of transfer. R.C. 2152.12(I); Juv.R. 30(G). A juvenile court's decision to exercise its discretion to transfer a juvenile to adult court must be supported by a preponderance of the evidence. *Nicholas*, 2022-Ohio-4276, at ¶ 29, 35. Further, the State bears the burden of persuasion when it asks the juvenile court to transfer a case to adult court. *Id.* at ¶ 27. "Thus, the facts presented to the juvenile court with respect to a discretionary transfer must persuade the court that the juvenile is not amenable to care or rehabilitation in the juvenile system." *Id.*; *see also Walker*, 2024-Ohio-729, at ¶ 21 (8th Dist.).

{¶ 109} Because an amenability hearing is "a broad assessment of individual circumstances," "inherently individualized and fact-based" and because R.C. 2152.12 is silent with regard to how a juvenile court should weigh the relevant factors, the decision regarding amenability rests in the discretion of the juvenile court. *In re M.P.*, 2010-Ohio-599, at ¶ 14; *State v. Gregory*, 2020-Ohio-5207, ¶ 32 (2d Dist.). We, therefore, review a juvenile court's amenability decision for abuse of discretion. *In re M.P.*, 2010-Ohio-599, ¶ 14.

{¶ 110} A court abuses its discretion "when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 2020-Ohio-6699, ¶ 19; *see also Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35 (describing the "common understanding of what constitutes an abuse of discretion" as "a court exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority"). A decision is an abuse of discretion when it is unreasonable, arbitrary or unconscionable. *See, e.g., State v. Brusiter*, 2023-Ohio-3794, ¶ 10 (8th Dist.); *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A decision is "unreasonable" when "'no sound reasoning process'" supports that decision. *State v. Ford*, 2019-Ohio-4539, ¶ 106, quoting *AAAA Ents. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A decision is "arbitrary" if "made 'without consideration of or regard for facts [or] circumstances.'" *State v. Beasley*, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed. 2014).

{¶ 111} When applying an abuse-of-discretion standard, this court may not substitute its judgment for that of the lower court. *State v. McFarland*, 2022-Ohio-4638, ¶ 21 (8th Dist.). Ordinarily, given the discretion afforded the juvenile court by the legislature in determining a juvenile's amenability to the juvenile justice system, so long as the juvenile court considers the appropriate statutory factors and there is some rational, factual basis in the record to support the juvenile court's findings when applying those factors, the juvenile court's amenability determination

cannot be reversed. *State v. Nicholson*, 2022-Ohio-2037, ¶ 206 (8th Dist.); *Jordan*, 2023-Ohio-311, at ¶ 11 (8th Dist.).

{¶ 112} Here, the juvenile court found, with little to no discussion or explanation, that every "relevant factor" in favor of transfer under R.C. 2152.12(D) applied and that none of the "relevant factors" against transfer under R.C. 2152.12(E) applied. D.T. argues that the juvenile court acted unreasonably in transferring D.T. to adult court because (1) the juvenile court's nonamenability finding was based on the "demonstrably false premise" that there were no remaining juvenile court options to hold D.T. accountable and restore and rehabilitate him and was "at odds with the principles and purposes of juvenile sentencing," (2) the record "completely lacks information" explaining why "the time the juvenile court had left in its jurisdiction," was not sufficient time to rehabilitate D.T. or why D.T. was considered sufficiently "mature" to be transferred, (3) its bindover decision was not based on "a thorough or particularized discussion of disposition options vis-à-vis [D.T.'s] specific needs" and (4) certain of the juvenile court's findings were clearly erroneous based on the evidence in the record. D.T. also contends that the trial court abused its discretion because it did not provide an explanation — at the amenability hearing or in its transfer order — of its bindover decision sufficient to allow this court to conduct a meaningful appellate review of that decision.

{¶ 113} The State responds that the juvenile court did not abuse its discretion in finding D.T. not amenable to juvenile court sanctions because (1) it considered all relevant factors related to transfer, (2) there was "some competent, credible

evidence" in the record to support the juvenile court's findings, including testimony from Williams, the victims and law enforcement, (3) "the juvenile court 'was not required to individually analyze each and every possible avenue for juvenile rehabilitation and decide that [D.T.] was not amenable to them,'" quoting *State v. Curtis*, 2016-Ohio-6978, ¶ 50 (3d Dist.), and (4) R.C. 2152.12 and Juv.R. 30 do not "require a juvenile court to issue written findings regarding the reasons for transfer," citing *State v. Douglas*, 20 Ohio St.3d 34, 36 (1985) (holding that no written findings were required under prior version of transfer statute and juvenile rule regarding transfer).

{¶ 114} We agree that certain of the juvenile court's findings do not appear to be supported by the record. With respect to the juvenile court's finding that R.C. 2152.12(D)(2) — i.e., "[t]he physical or psychological harm suffered by the victim was exacerbated because of the physical or psychological vulnerability or the age of the victim" — applied, the State argued below that D.T. "frequently targeted" vulnerable victims, i.e., "young women who were in their 20s, who were smaller in stature except for one." Here, the victims were approximately 20, 21, 22, 26 or 27 and 28 years old on the dates of the offenses at issue. Four of the five victims were women; one was a man. Each victim testified at the amenability hearing. Ives testified that she was 5′6″ tall. There is no evidence in the record regarding the stature of any of the other victims. According to the juvenile court's fact sheet, 14-year-old D.T. was 5′4″ tall and weighed 120 pounds at the time of the incidents. None of the victims testified that the harm he or she suffered as a result of the

incident was made any worse due to his or her age. None of the victims testified to having any physical or psychological condition that made him or her more vulnerable or exacerbated his or her harm.

{¶ 115} With respect to the juvenile court's finding that R.C. 2152.12(E)(7) — i.e., "[t]he child has a mental illness or intellectual disability" — did not apply, the State argued at the amenability hearing that this factor did not apply because D.T. "did not specify or qualify for any trauma diagnosis or anything like that, just cannabis use disorder and conduct disorder."

{¶ 116} As D.T. points out, however, Williams testified that D.T. was functionally illiterate, reading at a fourth-grade level. Despite this and a history of poor and widely varying grades, D.T. never received any special education services in school. D.T. was, however, doing well with schoolwork at the juvenile detention center.

{¶ 117} Williams also testified that while receiving mental health services through Applewood at the juvenile detention center, D.T. had been diagnosed with ADHD and was taking psychiatric medication for the condition. Although Williams stated in her evaluation report that D.T.'s diagnosis for ADHD was "not conclusively supported" by her limited evaluation and that she would need more information for her to "rule out" ADHD or a specific learning disorder, she indicated that "psychiatric diagnoses" of conduct disorder-unspecified onset-moderate severity and adjustment disorder with anxiety were suggested based on her diagnostic impressions.

{¶ 118} D.T. asserts that "while a juvenile court is permitted to assign whatever weight it wants to [a particular] factor, it is not permitted to find that [a] factor doesn't apply [where] there is evidence presented that it does." We agree. *See, e.g., State v. J.L.S.*, 2019-Ohio-4173, ¶ 52-55 (10th Dist.) (juvenile court's finding that R.C. 2152.12(E)(7) did not apply was not supported by the record where the record reflected that appellant qualified for several mental health diagnoses).

{¶ 119} It is likewise unclear from the record on what basis the juvenile court concluded that R.C. 2152.12(D)(7) — i.e., "the results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system" — and R.C. 2152.12(D)(9) — i.e., "[t]here is not sufficient time to rehabilitate the child within the juvenile system" — applied and that R.C. 2152.12(E)(8) — i.e., ""[t]here is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety" — did not apply.

{¶ 120} At the time of amenability hearing, D.T. had just turned 15. Accordingly, the juvenile justice system would have had nearly six years to rehabilitate him. Although "'there is no requirement that a juvenile first be committed to the [ODYS] before he may be transferred to the general division for trial as an adult offender,'" *Bryant*, 2024-Ohio-1192, at ¶ 19, quoting *State v. Whisenant*, 127 Ohio App.3d 75, 91 (11th Dist.1998), it is noteworthy that, prior to the cases at issue, D.T. had never been "locked up" in ODYS or any other type of secure facility.

{¶ 121} In its transfer orders, the juvenile court stated that it considered D.T.'s "prior commitments to the Department of Youth Services" in deciding to transfer D.T. to adult court; however, the evidence presented at the amenability hearing established that D.T. had never been committed to ODYS. The extent to which the juvenile court may have relied on this erroneous finding in determining that D.T. was not amenable to rehabilitation in the juvenile justice system is unclear from the record.

{¶ 122} Williams testified that D.T. had had three prior juvenile cases, that while on probation for other offenses, he had home detention violations for leaving home without permission and school suspensions for inappropriately touching staff and smoking marijuana in the restroom. She stated that prior attempted interventions in the form of multisystemic therapy, the Tapestry program and mentoring had not been successful. Williams testified that a school mentoring program was discontinued because D.T. refused to attend. She acknowledged, however, that successful engagement in multisystemic therapy and the Tapestry program required family participation. Williams admitted that D.T.'s lack of success with multisystemic therapy was attributable, in significant part, to D.T.'s family's failure to communicate with the program's staff, such that D.T. never even had an opportunity to engage in the program. Williams stated that she did not know whether the unsuccessful engagement within the Tapestry program was attributable to D.T. or to his family. D.T.'s mother admitted that she had failed to return calls to Williams and representatives of the multisystem treatment and Tapestry programs

and claimed that D.T.'s termination from, or failure to engage in, those programs was due to "miscommunication" issues between herself and representatives of those programs.

{¶ 123} The record reflects that, with the exception of his involvement in one fight and one incident in which he allegedly exposed himself to a female staff member, D.T. had no behavioral issues and had been making significant academic progress during the eight months he was in the juvenile detention center.

{¶ 124} D.T. also challenges the juvenile court's finding that R.C. 2152.12(D)(8) — i.e., "[t]he child is emotionally, physically, or psychologically mature enough for the transfer" — applied and that R.C. 2152.12(E)(6) — i.e., "[t]he child is not emotionally, physically, or psychologically mature enough for the transfer" — did not apply. At the amenability hearing, the State argued that D.T. was physically, emotionally and psychologically mature for transfer to adult court "because he is a male," "had no problem approaching these young women and a male with a firearm at gunpoint" and was "calm, cool and collected," "acting like an adult" and not "a scared little kid," when he committed the robberies. The State further argued that D.T. "understands the rights and wrongs of his actions when he commits these crimes and that he has the capacity to go to school . . . it could just be that he didn't want to perform well on these testings [sic] . . . and that he is in the high-offender range and (inaudible) for a criminogenic mindset."

{¶ 125} As stated above, D.T. was a 5′4″, 120-pound, 15-year-old black male. D.T. asserts that courts must be vigilant to ensure that "false racist stereotypes,"

including the "adultification" of black children, are not at work when assessing the maturity of black juvenile offenders. Appellant's Br. at 32, citing The Center for Policing Equity, *The Adultification of Black Children*, https://policingequity.org/resources/blog/the-adultification-of-black-children (accessed Jan. 18, 2024); American Psychological Association (Mar. 6, 2014), *Black boys viewed as older, less innocent than Whites, research finds*, https://www.apa.org/news/press/releases/2014/03/black-boys-older; *In the Matter of the Personal Restraint of Asaria Justice Miller*, 21 Wash.App.2d 257 (2022). D.T. argues that because the court "fail[ed] to articulate the reasoning behind its finding of maturity" and relied on "conclusory statements without accounting for the role racist stereotypes play in those perceptions," the juvenile court "erred in its assessment of [D.T.'s] maturity." Appellant's Br. at 33-34. We are mindful of these concerns.

**Lack of Sufficient Information to Conduct a Meaningful Appellate Review of Juvenile Court's Amenability Determination**

{¶ 126} In this case, the juvenile court did not identify or discuss the facts or evidence that supported its findings as to any of the amenability factors and did not explain its evaluation of, or the weight given to, any of the factors it considered in favor of or against transfer at the amenability hearing or in its transfer orders.

{¶ 127} At the conclusion of the amenability hearing, the juvenile court stated that it had considered all of the "discretionary bindover factors under ORC 2152.12(D) and (E)" it was "required to consider" and had also "take[n] into account"

"factors in addition to these that are listed, other information factors the Court had at its disposal." Although R.C. 2152.12(B)(3) requires that the juvenile court record "indicate the specific factors that were applicable and that the court weighed," the juvenile court did not identify the "other information factors" that it considered. It simply stated that, "based on the information that the Court has and considering all these factors," "[t]he factors in favor of transfer outweigh the factors that are against transfer" and, therefore, "the Court finds that [D.T.] is not amenable to our juvenile justice system."

{¶ 128} The judgment entries the juvenile court issued following the amenability hearing shed little additional light on the juvenile court's amenability determination. In its judgment entries, the juvenile court listed the records and information it considered in making its amenability determination as follows:

> The court finds after a full investigation, including a mental examination of said child made by a duly qualified person, and after full consideration of the child's prior juvenile record, family environment, school record, efforts previously made to treat and rehabilitate the child, including prior commitments to the Department of Youth Services, the nature and severity of the offense herein, the age, physical, and mental condition of the victim as effected by the matter herein, and other matters of evidence, that there are reasonable grounds to believe that the child herein is not amenable to care or rehabilitation within the juvenile system.[7]

---

[7] Although the juvenile court announced its finding, at the conclusion of the amenability hearing, that D.T. "is *not amenable* to our juvenile justice system," in its journal entries transferring the cases and setting forth its amenability findings, the juvenile court stated, "The court finds . . . that *there are reasonable grounds to believe that the child herein is not amenable* to care or rehabilitation within the juvenile system," — not that it had, in fact, been persuaded, based on the evidence presented, that D.T. was not amenable to care or rehabilitation in the juvenile justice system. (Emphasis added; emphasis deleted.) Although the parties have not raised the issue, we believe there is a difference between finding that there are "reasonable grounds to believe" a fact or

{¶ 129} The juvenile court indicated that it had "considered the relevant factors in favor of transfer pursuant to R.C. 2152.12(D)" and it made specific findings that the factors set forth in R.C. 2152.12(D)(1), (2) and (5)-(9), applied. The juvenile court further stated that it had "considered the relevant factors against transfer pursuant to R.C. 2152.12(E)" and found that "no factors apply." Once again, the juvenile did not identify the "other information factors" it considered that it referenced at the amenability hearing. Based on its findings as to which R.C. 2152.12(D) and (E) factors applied, the juvenile court made the further findings that "there are reasonable grounds to believe that the child herein is not amenable to care or rehabilitation within the juvenile system" and that "the safety of the community may require that the child be subject to adult sanctions."

{¶ 130} Let there be no doubt. We acknowledge that the offenses with which D.T. has been charged in these cases are very serious. It is alleged that when he was 14 years old, D.T. used a firearm to commit four carjackings (and one attempted carjacking), shot one victim and caused serious emotional and psychological injury and/or significant monetary losses to five victims. But the seriousness of D.T.'s alleged offenses cannot be the only consideration in determining whether D.T. was

---

circumstance exists and finding that a fact or circumstance, in fact, exists. The "reasonable grounds to believe" language was found in an earlier version of the statute. *See* former R.C. 2151.26. Effective 2002, R.C. 2151.26 was amended and recodified as R.C. 2152.12. *Smith*, 2022-Ohio-274, at ¶ 39, fn. 5, citing Am.Sub.S.B. No. 179, 148 Ohio Laws, Part IV, 9447, 9549.

properly bound over to adult court.[8] Were it otherwise, the General Assembly would have made such cases subject to mandatory transfer. A juvenile's amenability to rehabilitation and the need for community safety are separate, cumulative inquiries under the statute. R.C. 2152.12(B)(3).

**{¶ 131}** We take our responsibility reviewing cases involving the discretionary transfer of juvenile cases to adult court very seriously. In the past decade, Cuyahoga County has consistently bound over more children to adult court than any other Ohio county. In 2023, nearly one-third of all children transferred to adult court in the state of Ohio were in Cuyahoga County. In 2023, Cuyahoga County transferred more children to adult court than Franklin, Hamilton and Summit counties combined. Most of those children — over 90 percent in the last decade and over 91 percent in 2023 — are black. Nearly all of them are male. DataOhio, *Youth Transferred to Adult Court*, https://data.ohio.gov/wps/portal/gov/data/view/youth-transferred-to-adult-court (accessed Sept. 4, 2024). These statistics are concerning — particularly given the consequences of a transfer order. As the Ohio Supreme Court has stated:

> Research has shown that transferring a youth to adult court can have long-lasting negative impacts, including increased recidivism, a higher likelihood of physical and sexual abuse throughout their stay in prison, a significantly increased risk of suicide, inability to access appropriate

---

[8] We are aware that Ohio courts have repeatedly recognized that "'[t]he more serious the offense, the less amenable the juvenile will be to rehabilitation in the juvenile system.'" *State v. Johnson*, 2015-Ohio-96, ¶ 43 (8th Dist.), quoting *State v. West*, 2006-Ohio-3518, ¶ 24 (4th Dist.), citing *State v. Watson*, 47 Ohio St.3d 93, 96 (1989). However, this is little more than a recognition that "'a juvenile who has committed a major felony such as murder may require more time for rehabilitation than a juvenile whose offense is less serious.'" *Johnson* at ¶ 43, quoting *West* at ¶ 25.

education, and being subjected to harmful isolation. Research recommends transferring youth to the adult court system rarely.

Ohio Supreme Court, *Youth in Adult Court* (2018), https://www.supremecourt.ohio.gov/JCS/CFC/resources/juvenileBenchCards/8youthAdultCourt.pdf (accessed Sept. 4, 2024) [https://perma.cc/ZUU7-C6KK], citing Children's Law Center, *Falling Through the Cracks: A New Look at Ohio Youth in the Adult Criminal Justice System* (2012), available at nicic.gov/library/026406 (reporting that youth who are bound over and sentenced to prison are five times more likely to be sexually assaulted and two times more likely to be physically attacked by other inmates or injuries by staff, that youth in adult prisons are eight times more likely to commit suicide than youth held in juvenile detention centers and that, on average, children who are prosecuted as adults are 34 percent more likely to commit additional felonies than children who commit similar offenses but remain in the juvenile system).

{¶ 132} We recognize that a juvenile court has discretion to decide how much weight to give to each factor in R.C. 2152.12(D) and (E) and that any disagreement with the way the juvenile court weighed the factors is not a reason to reverse the court's discretionary decision regarding transfer to adult court. *State v. Carter*, 2023-Ohio-4310, ¶ 26 (8th Dist.), citing *Jordan*, 2023-Ohio-311, at ¶ 10, 12 (8th Dist.). However, although our review is deferential, our role is not to simply "rubber stamp" the juvenile court's amenability determination. We must conduct a meaningful review to ensure that the juvenile court's determination is the product

of an accurate, reasoned, individualized assessment of the alleged juvenile offender and his or her particular circumstances as supported by the record. *See, e.g., Jordan* at ¶ 11 ("Because the [juvenile] court concluded that the R.C. 2152.12(D) factors outweighed the factors considered under R.C. 2152.12(E), appellate review must include analysis and discussion of the totality of that consideration."). Here, following a thorough, careful examination of the record, we find that there is insufficient information in the record regarding the juvenile court's reasoning for this court to determine whether the juvenile court abused its discretion in determining that D.T. was not amenable to care or rehabilitation in the juvenile justice system. Because the juvenile court (1) did not identify all of the factors it considered, i.e., the "other information factors" referenced at the amenability hearing, (2) did not identify or discuss the factual or evidentiary basis for its determination that particular factors did or did not apply and (3) did not explain its weighing of those factors, we do not know, as detailed above, to what extent the juvenile court's decision may have been based on erroneous facts and cannot properly assess whether the juvenile court's decision was the product of a sound reasoning process or an unreasonable, arbitrary or unconscionable one. Certain courts, when faced with similarly deficient records, have reversed or vacated the juvenile court's amenability determination and remanded the cases for further proceedings. *See, e.g., J.L.S.*, 2019-Ohio-4173, at ¶ 80 (10th Dist.) (where juvenile court's amenability decision "fail[ed] to comply with R.C. 2152.12(B)(3) and lack[ed] sufficient clarity to enable meaningful appellate review" such that appellate court

could not determine whether any errors in its decision were prejudicial, matter remanded for juvenile court "to apply the proper standard, consider the evidence and weigh the same, resolve inconsistencies in its findings, and properly journalize its findings"); *State v. D. H.*, 2015-Ohio-3259, ¶ 17-19 (2d Dist.) (where juvenile court's transfer order contained "insufficient factual findings to identify how the court reached its conclusion that juvenile could not be rehabilitated in the juvenile system to permit meaningful appellate reviewing, reversing trial court's judgment and remanding case to juvenile court for reconsideration of its decision to relinquish jurisdiction and to provide a more thorough explanation as to why juvenile could, or could not, be rehabilitated in the juvenile system); *see also Nicholas*, 2022-Ohio-4276, at ¶ 58 (reversing transfer order where juvenile court's findings regarding the requirements for treating juvenile offender's dissociative-identity disorder and the capability of ODYS to meet those requirements were based on the court's mischaracterization of witness testimony and were not supported by evidence in the record and it was based upon those unsupported findings that court determined that juvenile was not amenable to care or rehabilitation in the juvenile system); *Carter*, 2023-Ohio-4310, at ¶ 26 (8th Dist.) (juvenile court abused its discretion by transferring the juvenile's case to adult court where its findings that there were no other mental health or rehabilitative services in the juvenile system to offer juvenile and that the victim suffered economic and psychological harm, were not supported by evidence in the record and absent such findings, the juvenile court's amenability determination was not supported by the preponderance of the evidence). *But see*

*State v. Blair*, 2017-Ohio-5865, ¶ 39 (5th Dist.) (criticizing *In re D.H.* and stating "[w]hile we agree that a court needs to genuinely consider the factors, and the record needs to reflect that fact consistent with R.C. 2152.12(B)(3), other courts have never gone as far as the Second District in directing the juvenile court's analysis").

{¶ 133} We do the same here. D.T.'s second assignment of error is sustained. We reverse the trial court's judgment, vacate D.T.'s convictions, vacate the juvenile court's transfer order and remand the case to the juvenile court for (1) a competency hearing and written determination of D.T.'s competency in accordance with R.C. 2152.58 and (2) if D.T. is deemed competent to proceed, for the juvenile court to reconsider the evidence and its amenability determination, resolve any inconsistencies in its findings, identify on the record all factors it considered in determining D.T.'s amenability, weigh those factors and explain the basis for its amenability determination. *See J.L.S.*, 2019-Ohio-4173, at ¶ 80.

{¶ 134} Judgment reversed; convictions vacated; bindover vacated; remanded to the juvenile court for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds that there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_Eileen A. Gallagher_

EILEEN A. GALLAGHER, PRESIDING JUDGE

EMANUELLA D. GROVES, J., CONCURS;
EILEEN T. GALLAGHER, J., DISSENTS (WITH SEPARATE OPINION)

EILEEN T. GALLAGHER, J., DISSENTING:

{¶ 135} I respectfully dissent from the majority's resolution of the first and second assignments of error. In my view, the juvenile court did not commit plain error by failing to strictly comply with R.C. 2152.58 in resolving issues of competency. Furthermore, the record contains competent and credible evidence supporting the juvenile court's determination that D.T. "is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that [he] be subject to adult sanctions." Accordingly, I would affirm the lower courts' judgments and D.T.'s resulting convictions.

**A. Legal Competency**

{¶ 136} In the first assignment of error, D.T. argues his statutory rights were violated when the juvenile court failed to hold a competency hearing or otherwise issue a written competency determination pursuant to R.C. 2152.58. D.T. contends that the court's failure to follow the required statutory procedures for competency before entering a bindover order deprived the adult court of jurisdiction over his cases.

{¶ 137} In this case, there is no dispute that on February 17, 2022, the juvenile court found good cause to refer D.T. for a competency evaluation pursuant to R.C. 2152.52(A). Thereafter, Dr. Frank Ezzo issued a written competency-assessment report, dated March 23, 2022, finding D.T. to be competent. However, as found by the majority, it is equally undisputed that the juvenile court failed to strictly comply with certain requirements of R.C. 2152.58 *after* the competency-assessment report was submitted for review.

{¶ 138} Relevant to this appeal, R.C. 2152.58 sets forth the following procedural requirements:

> (A) Not less than fifteen nor more than thirty business days after receiving an evaluation . . . the court shall hold a hearing to determine the child's competency to participate in the proceeding.
>
> . . .
>
> (C) In determining the competency of the child to participate in the proceeding, the court shall consider the content of all competency assessment reports admitted as evidence. The court may consider additional evidence, including the court's own observations of the child's conduct and demeanor in the courtroom.
>
> (D)(1) Except as otherwise provided in this division, the court shall make a written determination as to the child's competency or incompetency based on a preponderance of the evidence within fifteen business days after completion of the hearing. The court, by journal entry, may extend the period for making the determination for not more than fifteen additional days. If the court extends the period for making the determination, it shall make the written determination within the period as extended.

R.C. 2152.58(A), (C) and (D)(1).

{¶ 139} Upon review, I agree with the majority's discussion of R.C. 2152.58, and its determination that the juvenile court failed to complete the mandatory

aspects of the statute. The juvenile court did not hold a hearing to determine D.T.'s competency. Nor did the court issue a written determination as to the child's competency or incompetency. It is important to note, however, that once Dr. Ezzo's competency-assessment report was submitted for review under seal, counsel for D.T. was provided ample opportunity to object to the juvenile court's noncompliance with R.C. 2152.58 prior to the bindover proceedings — but failed to do so. In fact, defense counsel stipulated on the record that (1) D.T. was sent "for a competency evaluation and he came back as competent," and (2) "[D.T.] understands the nature of the [bindover] proceedings." (June 13, 2022, tr. 12.) Under these circumstances, D.T.'s failure to raise the issue below waived all but plain error.

{¶ 140} Under Crim.R. 52(B), a plain error affecting a substantial right may be noticed on appeal even though it was not brought to the trial court's attention. For the plain-error doctrine to apply, the party claiming error must establish (1) that "'an error, i.e., a deviation from a legal rule'" occurred; (2) that the error was "'an "obvious" defect in the trial proceedings'"; and (3) "that this obvious error affected substantial rights." *State v. Rogers*, 2015-Ohio-2459, ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "The elements of the plain-error doctrine are conjunctive: all three must apply to justify an appellate court's intervention." *State v. Bailey*, 2022-Ohio-4407, ¶ 9.

{¶ 141} To show that an error affected D.T.'s substantial rights, he must show "a reasonable probability that the error resulted in prejudice — the same deferential

standard for reviewing ineffective assistance of counsel claims." *Id.* Therefore, D.T. must establish "that the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004), quoting *Strickland v. Washington*, 466 U.S. 668, 694, (1984); *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982) ("A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse effect on the character and public confidence in judicial proceedings.").

{¶ 142} Even when an appellant establishes all of the elements necessary to demonstrate plain error, appellate courts are not required to correct the error. *Rogers* at ¶ 23. Instead, appellate courts have discretion when deciding whether to correct plain error. *State v. Jones*, 2020-Ohio-3051, ¶ 17. The Ohio Supreme Court has "admonished [appellate] courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes*, 94 Ohio St.3d at 27, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 143} After careful consideration, I do not believe the record contains sufficient indicia of incompetency to suggest the juvenile court's failure to strictly adhere to the procedural requirements of R.C. 2152.58 rose to the level of plain error. In this case, the issues of competency were carefully examined by trained experts in their field. Specifically, Dr. Ezzo's competency-assessment report expressly indicates that D.T. (1) is of average intelligence for children of similar age,

(2) had the mental capacity to understand the nature and objectives of the juvenile court proceedings, (3) was able to appreciate and comprehend the potential consequences of the juvenile proceedings, (4) understood the adversarial nature of court and the roles of its participants, and (5) was able to effectively communicate and assist in his own defense. Although the report acknowledged that D.T. had low literacy scores and exhibited symptoms of an Attention-Deficit/Hyperactivity Disorder, Dr. Ezzo unambiguously opined that D.T. did not have the type of diagnosed mental illness or developmental disability that would compromise his competency or ability to participate in the proceedings.

{¶ 144} Collectively, the factors discussed in Dr. Ezzo's final competency-assessment report went directly to the spirit of R.C. 2152.51 through 2152.59. The concerns raised by defense counsel before the juvenile court and the adult court have been carefully examined and considered by trained experts in their field. In each instance, D.T. has been deemed competent, and defense counsel did not raise timely objections or otherwise dispute the conclusions reached in the competency reports. Under these circumstances, I am unable to conclude that the juvenile court committed a manifest miscarriage of justice by accepting Dr. Ezzo's expert report without complying with the remaining requirements of R.C. 2152.58. The information in this record demonstrates that D.T. was competent as defined by R.C. 2152.51(A)(1), and the court's deviation from the statute did not influence the outcome of the proceedings.

{¶ 145} Accordingly, I would find no plain error and overrule D.T.'s first assignment of error.

## B. Amenability Hearing

{¶ 146} In the second assignment of error, D.T. argues the juvenile court abused its discretion by transferring his case to the common pleas court without sufficient evidence of nonamenability. D.T. contends that "there was competent and compelling evidence that he was, in fact, amendable to the care of the juvenile system — his young age, that he had not ever been to DYS or any lockup facility, his good behavior and school progress at the juvenile detention center and his treatable mental illnesses."

{¶ 147} As noted by the majority, in making the amenability determination, the juvenile court must consider whether the applicable factors under R.C. 2152.12(D) indicating that the case should be transferred outweigh the applicable factors under R.C. 2152.12(E) indicating that the case should not be transferred. R.C. 2152.12(B)(3). "The record shall indicate the specific factors that were applicable and that the court weighed." R.C. 2152.12(B)(3). Further, when the trial court determines a transfer is proper, the juvenile court "shall state the reasons for the transfer on the record." R.C. 2152.12(I); *see also* Juv.R. 30(G).

{¶ 148} The State bears the burden of persuasion when asking the juvenile court to transfer the case to adult court, though "the state need not produce affirmative evidence of nonamenability." *State v. Nicholas*, 2022-Ohio-4276, ¶ 57. "[A] juvenile court's decision to exercise its discretion to transfer a juvenile to adult

court must be supported by a preponderance of the evidence." *Id.* at ¶ 35. "An appellate court reviews a juvenile court's determination regarding a juvenile's amenability to rehabilitation or treatment in the juvenile system under and abuse-of-discretion standard [of review]." *Id.* at ¶ 22. "If there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion." *Middendorf v. Middendorf*, 82 Ohio St.3d 397, 401 (1998).

{¶ 149} The juvenile court's wide latitude to determine whether to retain or relinquish jurisdiction over a child's case means that the court also has the discretion to decide how much weight to give to each factor in R.C. 2152.12(D) and (E). *In re M.A.*, 2019-Ohio-829, ¶ 33 (12th Dist.), citing *State v. Everhardt*, 2018-Ohio-1252, ¶ 22 (3d Dist.); and *State v. Marshall*, 2016-Ohio-3184, ¶ 15 (1st Dist.). Moreover, an appellant's disagreement with the way the juvenile court weighed the factors is not a reason to reverse the court's decision. S*ee State v. Ramsden*, 2021-Ohio-3071, ¶ 23 (12th Dist.) ("[G]iven that it is the juvenile court, and not [the appellate] court, that has the discretion to determine how much weight should be afforded to the factors set forth in R.C. 2152.12(D) and (E), [D.T.'s] challenge to the weight that the juvenile court ultimately decided to attribute to each [of] those factors lacks merit.").

{¶ 150} In this case, the juvenile court orally provided the reasons supporting its bindover order at the conclusion of the amenability hearing, stating:

> All right. Thank you. So for this hearing the Court is required to consider all the discretionary bind-over factors under ORC 2151[.12] (D) and (E), and the Court did consider all of those factors in addition to these that are listed, other information factors the Court had at its disposal. And based on the information that the Court has and

considering all these factors the Court finds that [D.T.] is not amenable to our juvenile justice system. The factors in favor of transfer outweigh the factors that are against transfer. So with this finding, the Court transfers – this is a discretionary transfer, so the Court will transfer these cases to Adult Court.

(Tr. 188.)

{¶ 151} Within the corresponding journal entry, the juvenile court reiterated the reasons supporting for the transfer, stating:

The court finds after a full investigation, including a mental evaluation of said child made by a duly qualified person, and after full consideration of the child's prior juvenile record, family environment, school record, efforts previously made to treat and rehabilitate the child, including prior commitments to the Department of Youth Services, the nature and severity of the offenses herein, the age, physical, and mental condition of the victim as effected by the matter herein, and other matters of evidence, that there are reasonable grounds to believe that the child herein is not amendable to care or rehabilitation within the juvenile system.

{¶ 152} In support of its conclusion, the juvenile court expressly identified the factors it weighed in determining that the transfer was appropriate. Specifically, the judgment entry reflects that the juvenile court relied extensively on the following factors: (1) the victims suffered physical or psychological harm, or serious economic harm; (2) the harm suffered by the victims was exacerbated because of the physical or psychological vulnerability or age of the victims; (3) D.T. had a firearm on or about his person or under his control at the time of the offenses; (4) D.T. was awaiting adjudication or disposition and was under community control for a prior delinquent child adjudication; (5) D.T. was emotionally, physically, or psychologically mature enough for a transfer; (6) the results of D.T's previous juvenile sanctions and programs indicate that rehabilitation will not occur in the

juvenile system; and (7) there would not be sufficient time to rehabilitate D.T. within the juvenile system. *See* R.C. 2152.12(D)(1), (2), (5), (6), (7), (8), and (9). The court found no R.C. 2152.12(E) factors applied.

{¶ 153} Based on the court's oral and written findings, I would conclude the juvenile court complied with its obligations under the statute by providing reasons for its judgment and expressly identifying the specific factors it considered under R.C. 2152.12. The majority's belief that something more was required of the juvenile court promotes an analysis that is not supported by the language of the statute. In fact, numerous districts in this state have rejected such a strict approach, reiterating that "[a]s long as the court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors," the juvenile court does not abuse "its discretion in deciding whether to transfer jurisdiction." *In re D.M.*, 2017-Ohio-8768, ¶ 47 (6th Dist.), quoting *State v. Blair*, 2017-Ohio-5865, ¶ 39 (5th Dist.); *see also State v. Reeder*, 2016-Ohio-212, ¶ 18 (10th Dist.); *State v. Marshall*, 2016-Ohio-3184, ¶ 15 (1st Dist.); *State v. Rice*, 2016-Ohio-5372, ¶ 18, fn. 2 (12th Dist.); *State v. Cunningham*, 2022-Ohio-3497 (6th Dist.). Nor is the juvenile court required to "'individually analyze each and every possible avenue for juvenile rehabilitation and decide that [the juvenile] was not amenable to them.'" *Id.* at ¶ 50, quoting *State v. Curtis*, 2016-Ohio-6978, ¶ 50 (3d Dist.).

{¶ 154} Viewing the record and the court's oral and written statements together, I believe this court has sufficient information before it to conduct a

meaningful review of the juvenile court's amenability determination, including the testimony of a juvenile-detention center employee, members of D.T.'s family, the court psychiatric clinic doctor, the victims of each incident, and the investigating officers. It is unclear what additional information is needed from the juvenile court to assess the sufficiency of its conclusions under R.C. 2152.12. Accordingly, I disagree with the majority's determination that a limited remand is required to have the juvenile court reconsider the evidence and explain the basis for its amenability determination. The juvenile court has already done so.

{¶ 155} Regarding the court's analysis under R.C. 2152.12, I would further conclude that there is some rational basis in the record to support the court's findings under R.C. 2151.12(D) and (E). In this case, the juvenile court heard ample evidence at the amenability hearing that carefully outlined D.T.'s personal history and his criminal activity in this matter.

{¶ 156} The record reflects that D.T. has a lengthy history with the juvenile court, including (1) delinquency adjudications for burglary and theft in Cuyahoga J.C. No. DL-19-110590, (2) delinquency adjudications for attempted breaking and entering, theft, theft, criminal damaging, obstructing official business, and unauthorized use of a vehicle in Cuyahoga J.C. No. DL-20-109270, and (3) delinquency adjudications for theft in Cuyahoga J.C. No. DL-20-106080. During the bindover proceedings, D.T. also had a pending case before the juvenile court that stemmed from an incident occurring just days before D.T. committed the spree of carjackings in this case. While on probation, D.T. committed a number of home-

detention violations: "leaving home without permission, being suspended from school for inappropriately touching [a] school staff member. More recently, a [D.T.] was suspended from his new school for creating unsafe conditions."

{¶ 157} The diagnostic evaluation further established that D.T.'s "current criminal behavior is significant" and that he presents a high risk for future violence towards community members based on various historical, contextual, and individual factors. In addition, forensic psychologist, Dr. Lynn Williams, opined that D.T. demonstrated a level of emotional, physical, and psychological maturity during the pendency of this matter. As noted by Dr. Williams, D.T. "is displaying a higher level of sophistication and maturity and using these emerging skills in a criminogenic manner." Relatedly, the evaluation revealed "that [D.T.] is not intellectually disabled and does not suffer a severe psychiatric disturbance that would impair" his ability to perceive reality. Dr. Williams further noted that D.T. received "mixed" scores for treatment amenability, indicating that "[he] has some characteristics that are difficult to treat." Dr. Williams expounded on her discussion of D.T.'s amenability to treatment as follows:

> [D.T.] has had several attempted treatment interventions (MST, mentoring, Tapestry) which were unsuccessful, and no positive improvements were noted. As discussed in the SAVRY results, he displays a negative attitude towards authority and is unable to adhere to the rules and expectations while being monitored by probation, on home detention and even within the structured setting of the [juvenile detention center.] He has demonstrated inconsistencies in his desire to improve his behavior by following all rules and regulations. In the [juvenile detention center], he has displayed a number of both positive and negative behaviors. His poor compliance with the court system and the current significant charges for his relatively young age are

concerning. Previous interventions have been unsuccessful primarily due to [D.T.]'s poor motivation coupled with a lack of consistent family involvement that did not produce sustainable gains.

Collectively, Dr. Williams expert testimony directly addressed D.T.'s maturity, risk of future violence, mental illnesses and disabilities, and amenability to care. In my view, this evidence constituted competent, credible evidence supporting the juvenile court's substantial reliance on the factors outlined under R.C. 2152.12(D)(6)-(9).

{¶ 158} With respect to the court's reliance on R.C. 2152.12(D)(1)-(2) and (5), it is well settled the seriousness of the alleged act is relevant to "the assessment of the probability of rehabilitating the child within the juvenile justice system" because the more serious the offense, the less amenable the juvenile will be to rehabilitation in the juvenile system. *State v. Watson*, 47 Ohio St.3d 93, 95 (1989). *See also State v. Hennings*, 2019-Ohio-4675, ¶ 25 (8th Dist.) ("The severity of a crime can be a strong indicator that there remains insufficient time to rehabilitate a child offender in the juvenile justice system."), citing *State v. Johnson*, 2015-Ohio-96, ¶ 43 (8th Dist.), and *State v. Amos*, 2016-Ohio-1319, ¶ 43 (1st Dist.) (a juvenile court can consider the number and nature of the committed offenses when determining if the child is amenable to the juvenile justice system).

{¶ 159} In this case, the seriousness of D.T.'s conduct and his complete disregard of the associated consequences cannot be understated. D.T. was the principal offender in a systematic crime spree that threatened the lives of unsuspecting victims. During this crime spree, D.T. brandished a firearm on each occasion and deprived four of the five unsuspecting victims of their personal

property. Ultimately, D.T.'s increasingly reckless conduct resulted in the inevitable shooting of a young woman that remarkably did not result in the loss of life in our community. His conduct was unprovoked and resulted in physical, emotional, and psychological harm that continues to affect the daily lives of those harmed.

{¶ 160} In addressing the seriousness of the offenses and the nature of the harm caused, the majority suggests that the victims inherently lacked vulnerability in this case because they were in their mid-to-late 20s, while D.T. was a 14-year-old, 120 pound juvenile. With respect, I believe it is improper to suggest the harm suffered by each victim was not exacerbated by the time, location, and nature of the incidents, including the inherently vulnerable position the victims were in when they were suddenly approached by an armed male while approaching the safety of their own vehicles. Three of the victims, for example, each described how D.T.'s conduct has impaired their ability to feel safe in their communities and in their private vehicles. Likewise, D.T.'s age and apparent lack of size was immaterial to the defenseless victims who had a gun pointing at them. The factors corresponding to D.T.'s personal circumstances are critical to the analysis under R.C. 2152.12. However, this court must be careful to not unintentionally diminish or otherwise minimize the factors outlined in R.C. 2152.12(D)(1), (2), and (5). The factors relating to the seriousness of the offenses and the harm caused to the victims are of equal importance under the controlling statute.

{¶ 161} Nevertheless, contrary to D.T.'s suggestion on appeal, the juvenile court's analysis under R.C. 2151.12 did not rely exclusively on the seriousness of the

offenses or the harm caused to the victims.  Rather, the juvenile court's judgment also relied extensively on D.T.'s prior history of juvenile adjudications, his repeated probation violations, and his conduct in the juvenile detention center, including his participation in a physical altercation and his act of exposing his private parts to a female employee.  Finally, and perhaps most importantly, the court also relied extensively on the expert testimony of Dr. Williams, who specifically addressed the relevant recidivism and amenability factors in her evaluation and report.

{¶ 162} Though D.T., and perhaps the majority of this panel, may disagree with the weight afforded to the relevant statutory factors, this is insufficient to show that the juvenile court's findings were based on erroneous facts or an unreasonable, arbitrary, or unconscionable application of R.C. 2152.12.  *See In re M.A.*, 2019-Ohio-829, ¶ 33 (12th Dist.); *State v. Walker*, 2024-Ohio-729, ¶ 29-31 (8th Dist.); *State v. Cunningham*, 2022-Ohio-3497, ¶ 100-101 (6th Dist.).

{¶ 163} I am further cognizant of the statistical information referenced by the majority and the rising number of juvenile bindovers in Cuyahoga County. Unfortunately, these numbers directly correlate to a troubling trend of gun violence amongst the youth in our community and not, in my opinion, an unjustified use of the bindover procedure by the state or an unsatisfactory application of R.C. 2151.12 by juvenile court judges in this county.  While the statistical trends warrant prompt attention and consideration, these matters are best addressed by the General Assembly which has carefully developed the bindover procedure and the factors to be considered.  As it relates the juvenile court, the majority correctly states that an

amenability determination is "inherently individualized and fact based," and cannot rely exclusively on broadly complied statistics. *In re M.P.*, 2010-Ohio-599, at ¶ 14; *State v. Gregory*, 2020-Ohio-5207, ¶ 32 (2d Dist.). Thus, the juvenile courts' considerations are narrowly limited to the evidence before it, including the testimony of experts who have specialized training and experience in assessing a juvenile's rate of recidivism and amenability to rehabilitation in the juvenile system. In turn, this court is solely responsible for ensuring that the juvenile court complied with the requirements of the statute and, if so, whether the court's judgment is supported by the record. Although we cannot substitute our judgment for that of the juvenile court, such considerations do not amount to merely rubber stamping a juvenile court's judgment.

{¶ 164} Based on the foregoing, I would find no abuse of discretion in the juvenile court's determination that D.T. was not amenable to rehabilitation in the juvenile system. The record clearly reflects that the juvenile court weighed the appropriate statutory factors listed in R.C. 2152.12(D) and (E) and there is competent, credible evidence in the record to support the court's findings under the statute. Accordingly, I would overrule the assigned errors and affirm the lower courts' judgments.